ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY *v.* COX.

Opinion delivered May 17, 1926.

1. RELEASE—MISTAKE OF FACT.—Where a release of liability was procured from a passenger injured in the derailment of a train by means of false representations, made by a surgeon connected with the railroad hospital, to the effect that her injuries were cured, when in fact they were not, the release was not binding.

2. RELEASE—RESCISSION—TENDER OF SUM PAID.—Where a passenger was induced to sign a release of liability for personal injuries by false representations, she is not bound in this State to return the sum paid before suing to recover the damage sustained,

though the injury was received and the release executed in another State, in which she would have been bound to make such return before suing, if her suit had been brought in that State.

3. CONTRACTS—ENFORCEMENT OF REMEDY.—When a party comes into court to enforce his remedy upon a contract, that remedy will be enforced in accordance with the laws of the State regulating the remedy, and not according to the remedy of the State where the contract was made.

4. TRIAL—GENERAL OBJECTION TO INSTRUCTION.—Under a general objection to an instruction, the Supreme Court will determine whether or not there are any inherent defects therein, and, if so, whether, construing the charge as a whole, the giving of the instruction was prejudicial to appellant.

5. TRIAL—ERRONEOUS INSTRUCTION CURED BY OTHER INSTRUCTIONS.—An instruction in a personal injury case that, if the sum paid by the railroad to the plaintiff was not sufficient to compensate her for damages sustained, the jury should find the amount necessary to compensate her and deduct the amount already received, though erroneous as submitting only the question whether the passenger was sufficiently compensated, was not prejudicial where other instructions submitted the issue whether the release of the railroad was procured by fraud and the issue as to the railroad's liability.

6. TRIAL—INSTRUCTIONS—CONSTRUCTION AS A WHOLE.—Where, from the language used or the relation which the instructions bear to each other, they may be read together without conflict and as a harmonious whole, they will be so treated.

7. CARRIERS—INJURY TO PASSENGER—BURDEN OF PROOF.—While, in an action by a passenger to recover for personal injuries received in a train wreck, the passenger had the burden of alleging and proving the liability of the carrier, she met this burden and established a *prima facie* case when she proved that she was a passenger on defendant's train, and that the train was derailed, resulting in her injury.

Appeal from Mississippi Circuit Court, Osceola District; *W. W. Bandy,* Judge; affirmed.

*E. T. Miller* and *W. J. Orr,* for appellant.

*J. T. Coston,* for appellee.

WOOD, J. Lulu M. Cox instituted this action in the Mississippi County Circuit Court against the St. Louis-San Francisco Railway Company. The plaintiff alleged that on September 1, 1922, she was a passenger on one

of defendant's trains going from St. Louis, Missouri, to Osceola, Arkansas; that the train was derailed near Starland, Missouri, resulting in severe injuries to plaintiff's person and to her damage in the sum of $3,000, for which sum she prayed judgment.

The defendant answered and set up a written release executed October 25, 1922, in which it was recited that, on September 1, 1922, Lulu M. Cox was a passenger on train No. 805 of the St. Louis-San Francisco Railroad Company, which train was derailed at bridge No. 9705, near No. 76, Missouri; that she received severe personal injuries and loss and damage to personal property, which she claimed rendered the railroad company liable in damages; that the railroad company denied liability, and she, being desirous to compromise and adjust the entire matter, settled for the consideration of $1,575, to her in hand paid, and she forever released the railroad company from any and all liability for damages for such injuries, and acknowledged full satisfaction of all liability of the company to her. The release further recited that, at the time she received the money and executed the release, she was of lawful age and legally competent to execute the release, and before executing it she had fully informed herself of its contents and executed it with full knowledge thereof; that she had read the same, and understood it. The defendant alleged that the release was executed in Missouri, and, under the laws of that State, before plaintiff could maintain the action to cancel the release, she would have to tender to the defendant the amount of money paid to her in consideration of the release, which plaintiff had not done.

The plaintiff testified that she was a passenger on defendant's train coming from Ohio to Osceola, Arkansas; that the train was wrecked at Starland, Missouri; that plaintiff was severely injured. She was taken to the Frisco Hospital in St. Louis, Missouri, where two x-ray pictures were taken. She was treated by Dr. Woolsey, a surgeon of the railroad company. She was in the hospital exactly two months. While there she

made a settlement with the railroad company. The consideration paid her was $1,575. In order to get her to sign the release, Dr. Woolsey represented to her that the injury to her ankle was all right, but that it would be easily injured again. He seemed to think it was all right. He told witness to take the crutches and use them. He said witness was all right, but must take precaution not to injure it again. Witness would be as strong as ever when the bones had had time to finish healing and time for the swelling to go down. These statements were made before witness signed the release, and, if she had not believed what he said, she would not have executed the same. She refused to settle until Dr. Woolsey told her it was all right. Witness signed the release about a week before she came home in November. Witness was suffering horribly, and went to Memphis to consult Dr. Campbell, who told her that she needed a brace. He stated that her ankle was dislocated, and she would have to have it rebroken. She went to a hospital in Memphis, and had the ankle broken and reset on November 10. Dr. Campbell performed the operation. Witness suffered a great deal. She was in the hospital at Memphis two weeks and a day. Witness still has to use a brace and crutches. Witness was a teacher, and was not able to follow her profession. On cross-examination witness described the derailment of the train resulting in her injury, and stated that, after she was taken to the hospital, two x-ray pictures were taken. She understood the purpose of those pictures was to take a picture of the bones, and she asked to see them, but they would not show them to her. She was anxious to go home. Witness further detailed the injuries and the treatment she received after leaving the hospital, which it is unnecessary to set forth.

On cross-examination in regard to the release she stated that she received the money and executed the release; that she read the release, and understood it; after describing her injuries and treatment at the hospital in Memphis, she concludes her testimony by saying

that Dr. Campbell had informed her that he could not give her complete relief, and that her injury was permanent. She stated, in answer to a question, that she had scarcely any movement in her ankle, and demonstrated the same before the jury, saying that she could move it backwards and forwards a little, but not to the side. Witness weighed about 208 pounds when she was injured. Her ankle was turned over, the main portion of the foot turning in and the heel out.

Dr. Campbell testified that his specialty was orthopedic surgery. He qualified as an expert in the treatment of injuries and diseases of the bones, joints and deformities thereto. He attended Mrs. Cox, who gave witness a history of her injury. When she came to see witness in November, 1922, she was walking on crutches with difficulty and with much pain. Her left ankle was swollen and tender, and her left foot was markedly turned out, showing an unreduced Potts fracture. Witness then described the operation which he performed to refracture and realign the bones into position—a rather extensive procedure on both bones. Witness described in detail the effect of the operation and result of the injury. The effect of the witness' testimony was that, when Mrs. Cox came to see him, the fracture to her ankle was unreduced. She had a deformity that appears in cases where the fracture has never been set. The operation witness performed would not have been necessary if the fracture had been properly set and no complications thereafter, and if the bones had united in their proper positions, and if the treatment had continued of holding the foot in the proper position for a sufficient length of time, which requires six months or a year. Witness could not state definitely that she did not have proper attention at the hospital in St. Louis, because witness had seen the patient a number of weeks after the fracture was set. Witness knew that fractures often became misplaced and had to be done over. Witness concluded his cross-examination by stating, in effect, that the two fractures which witness had described, to the

limb of Mrs. Cox, if properly reduced within a reasonable time after the accident, and proper instructions as to the use of the limb had been followed, would have united perfectly, and there would have been a realignment of the ankle in six months. But Mrs. Cox was 54 years of age, and a fracture of her joint might have been a permanent disability, even under the best treatment from the first. She should not have attempted to put her weight on that limb for six or eight weeks after the injury, and then with support. She would probably have to use crutches on account of the pain at that time, and should have been protected by arch supports and braces. As a rule, one could not discard crutches in such cases after the removal of the cast under one or two months, the time differing in different individuals.

The defendant introduced Dr. Howell, who qualified as an expert physician and x-ray specialist. He examined the x-ray pictures of an ankle made an exhibit to Dr. Campbell's deposition showing the fracture of the tibia at the point and also a fracture of the fibula. He stated that it was not uncommon for a person to grow up with a deformed ankle and then to have the same straightened out and to have a perfect ankle. It was not a serious thing to have a tibia or fibula fractured. The usual result of a fracture of that kind, if a person puts weight on the leg before it is perfectly united, is a displacement. His testimony was to the effect that a woman of Mrs. Cox's age and weight, with two small bones of her leg broken, as the x-ray pictures taken by Dr. Campbell indicate, if she was injured on September 1 and left the hospital November 1, purposely or otherwise, on that leg, she would likely have just what the picture indicates.

Dr. Woolsey testified that he was a physician and surgeon connected with the Frisco Employees' Hospital Association in St. Louis. He qualified as an expert. He attended Mrs. Cox in the hospital in St. Louis. He explained in detail the treatment of Mrs. Cox, and his testimony tended to prove that his treatment was the usual treatment given patients in her condition, and

that it was the correct treatment.   He stated that Mrs. Cox left the hospital voluntarily.   She was receiving free treatment, and would have received such treatment if she had remained longer.   At the time she left, witness didn't tell her that her ankle was entirely healed. It was not healed.   It would have required about three months' more treatment for a complete healing.   It was still necessary for her to use crutches when she left the hospital.   At the time Mrs. Cox signed the release on October 25, 1925, witness passed her room at the hospital when the claim agents were there, and they later told witness that they had settled with Mrs. Cox.   These agents asked witness if it were all right for Mrs. Cox to go home, and witness replied that it was if she went on crutches.   Witness didn't tell her or the claim agents that the ankle had completely healed and that it was as good as ever.   Witness never told Mrs. Cox that her ankle would be as good as ever.

The testimony of the claim agents who made the settlement with Mrs. Cox and took the release was to the effect that they were authorized to pay her the amount named in the release, and Mrs. Cox stated that she would take it and was glad to get the money, because she wanted to get back to her school; that she had a contract, and wanted to get back on November 1 to fill that contract.   These witnesses stated that, during the negotiations, they did not ask Dr. Woolsey if Mrs. Cox was entirely healed, cured, and all right, and they did not hear Dr. Woolsey say anything to Mrs. Cox about her injury being healed.   The question of her condition at that time was not discussed.   Mrs. Cox first broached the subject of a compromise on October 24.   She was not ready to settle before that day.   One of the witnesses stated that he had met Mrs. Bragg, Mrs. Cox's daughter. He was asked this question: "Weren't you around there trying to get Mrs. Cox to settle, and didn't she (Mrs. Bragg) ask you not to settle with Mrs. Cox in her absence?"   Witness answered, "Nothing of the kind was said."

Mrs. Cox was recalled in rebuttal, and testified that the two claim agents were in her room when Dr. Woolsey came there and opened the door, and seemed surprised that they were there. Witness had not then signed the papers. One of the agents said, "Isn't this woman all right?" and Dr. Woolsey said, "She is all right—it will take a little time to reduce that swelling—she will be all right." The witness, on cross-examination, stated that, on a former trial of the case, about a year before, she had stated, in answer to a question, that, while she and the claim agents were in a conversation in regard to the settlement, and after a part of the conversation, Dr. Woolsey came to the door and opened it and looked in, and they asked him about the condition of witness' ankle, and he said it was healed. They also asked him how long it would be before witness would walk, and the doctor said, "Well, witness ought to walk within four months from the time she was injured." Witness had then been injured two months. Witness further stated that on the former trial she had stated that there wasn't anybody present except the two adjusters when she signed the release, and that is what she now states.

Mrs. Bragg testified for the plaintiff, in rebuttal, that she was the daughter of Mrs. Cox. She went to see her mother about three weeks after she was injured. Witness met Harwell, one of the claim agents. She asked him to come to the hospital, because her mother stated that they had been suggesting a settlement. Witness did not want her mother to settle unless witness was present, and told Harwell that witness did not want any mention made of settlement unless witness was present. He agreed on his word as a gentleman. Witness had not given her mother instructions not to settle until witness came again. She knew nothing about witness' talking to Harwell. Witness stated that her mother kept off of her leg until she went to Memphis.

In its instruction No. 1 the court told the jury in effect that if, at the time of or before the release was executed and the consideration paid the plaintiff, Dr.

Woolsey misrepresented the condition of her ankle and made her believe that her physical condition was much better than it really was, and that she was ignorant of her real physical condition, and that such representations caused her to execute the release, then she would not be bound by it, and the jury would disregard the same and find for the plaintiff.

Instruction No. 2 was as follows: "The plaintiff has been paid the sum of $1,575, and if you find that the sum of $1,575 was sufficient to compensate the plaintiff for the damages which she has sustained, then your verdict will be for the defendant; on the other hand, if you find that the sum of $1,575 which she received was not sufficient to compensate her for the damage which she has sustained by her injuries, then your verdict will be for the plaintiff for such a sum as you may find, from a preponderance of the evidence, would compensate her for the damage which she has sustained, but you will deduct therefrom the said sum of $1,575."

Instruction No. 3 in effect told the jury that if they found for the plaintiff they should take into consideration certain elements of damage (naming them), and allow the plaintiff compensation therefor, and concluded the instruction as follows: "But, if you find that her damages amount to more than $1,575, you will deduct said sum from the amount of your verdict."

The defendant, in its prayers for instructions numbered 3 and 4, in effect prayed the court to instruct the jury that the release which it pleaded in defense to the action was binding on both parties to the settlement, unless the plaintiff could prove that she was induced to enter into the same through the misrepresentation of the defendant as to the nature and extent of her injuries, and that she was ignorant of her condition; that, if the release were valid, the plaintiff would be bound by the amount named therein, although the jury might believe that her injuries would have entitled her to more; that, if a fraud was perpetrated upon her, it was her duty, as soon as she discovered the fraud, to have tendered to the defendant

the amount she received in settlement. The court modified these instructions, and gave the same in substance, except that the court refused to tell the jury that it would be the duty of the plaintiff, if the settlement was made through misrepresentation of the defendant and fraud thereby perpetrated upon her, to tender to the defendant the amount of the settlement as soon as she discovered the fraud. The court also instructed the jury that the burden of proof was upon the plaintiff to show that the release was obtained through false representations on the part of the defendant. The verdict and judgment were in favor of the plaintiff, and the defendant duly prosecutes this appeal.

1. This court has held in *St. Louis, etc. Ry. Co.* v. *Hambright,* 87 Ark. 615, quoting syllabus: "If the chief surgeon of the railroad company in good faith represents to an injured employee that his injuries are slight and temporary, when they are serious and permanent, and thereby misleads him into signing a release of the railroad company from damages, such release is not binding." In this case we held also that it is not a condition precedent to the maintenance of the action that the consideration for the release be tendered to the defendant before the action is instituted. And in *St. Louis, etc., Ry. Co.* v. *Smith,* 82 Ark, 105, we held in effect that, where a passenger was induced to sign the receipt by false representations, which she relied on as to its contents, she would not be bound to return the sum paid before suing to recover the damages sustained. See also *Industrial Indemnity Co.* v. *Thompson,* 83 Ark. 575-584; and *Pekin Cooperage Co.* v. *Gibbs,* 114 Ark. 571, where we said: "Nor is a releasor required to return that which in any event he would be entitled to retain, either by virtue of the release itself or of the original liability, but credit must be given on the judgment." See also *Kilgo* v. *Continental Casualty Co.,* 140 Ark. 336-343.

Under the doctrine of the above cases it is not a condition precedent to the maintenance of this action by the appellee that she tender to the appellant the considera-

tion received by her for the execution of the release. In other words, in this jurisdiction the failure of tender is a matter that does not reach to the basis of the right of action itself. It is not a matter of substance relating to the right to maintain an action, but pertains only to the procedure or remedy. "The broad, uncontroverted rule is that the *lex loci* will govern as to all matters going to the basis of the right of action itself, while the *lex fori* controls all that is connected merely with the remedy." 5 R. C. L., p. 917, § 11. In *Shores-Mueller Co.* v. *Palmer,* 141 Ark. 64-70, we said: "It is well settled in this State that, when a party comes into court to enforce his remedy upon a contract, that remedy will be enforced in accordance with the laws of this State regulating the remedy, and not according to the remedy of the State where the contract was made. *Lawler* v. *Lawler,* 107 Ark. 70, and *Huff* v. *Iowa City State Bank,* 134 Ark. 495." See also *Person* v. *Williams-Echols Dry Goods Co.,* 113 Ark. 467-470.

In Missouri it is held that "a plaintiff cannot recover as against a settlement on the ground that it was induced by fraud, where he had not tendered back the amount received as consideration for the settlement." *Althoff* v. *St. Louis Transit Co.,* 102 S. W. 642, and cases there cited. See also *Metropolitan Paving Co.* v. *Brown, etc.,* 274 S. W. 815. Learned counsel for appellant contend that, since the release under review was executed in Missouri, the Missouri rule as stated above should apply here. But the Missouri Supreme Court treats the matter of tendering or refunding of the consideration for the release in such cases as "a matter going to the basis of the right of action itself." It is a matter of substance, a condition precedent to the maintenance of the action. But under our decisions, as above stated, a failure to refund or make tender of the consideration for the release in such cases relates only to the remedy, and is not a matter of substance pertaining to the right of action itself. It is a universal rule that laws relating to the remedy can have no extraterritorial effect. As is said

in 5 R. C. L., p. 941, § 28, "it is a universally established rule that the affording of remedies in one State for enforcing a contract made in another, depends entirely upon judicial comity, and that the remedies and procedure are therefore governed entirely by the *lex fori.* Considering the matter apart from the principle of comity, there is not the same reason for looking to the intent of the parties in the case of the remedy as in the case of matters pertaining to the substance, for the parties do not necessarily look to the remedy when they make the contract." See numerous cases cited in note.

2. The issue as to whether or not the release was executed under circumstances which constitute fraud on the rights of the appellee was submitted to the jury under correct instructions. The issue was one for the jury under the evidence. The instructions on the issue of fraud conformed to the law as declared by this court in *St. Louis I. M. & S. Ry. Co.* v. *Hambright, supra; Chicago Rock Island Ry. Co.* v. *Smith,* 128 Ark. 223; *Western Cabinet, etc., Co.* v. *Davis,* 121 Ark. 370. There was a sharp conflict in the evidence. The verdict of the jury on the issue of fact is conclusive here.

3. Prayer for instruction No. 2, set out above, given at the instance of the appellee, relates only to the question as to whether or not the amount paid appellee was sufficient to compensate her in damages for the injuries she had sustained. If the jury found from the evidence such sum was not sufficient, they should find from a preponderance of the evidence an amount necessary to compensate her for the damages she had sustained, and deduct therefrom the amount she had already received. If this instruction stood alone, the ruling of the court in giving the same would be erroneous and prejudicial, because it does not submit the issue as to whether or not the appellant was liable under the evidence, and does not submit the issue as to whether or not the release was procured by fraud, and makes the entire case turn on whether or not the appellee had received a sufficient sum to compensate her for the damages she had

sustained. But, when this instruction is considered in connection with the other instructions immediately preceding and following, it occurs to us the jury could not have been misled, and that the giving of the instruction was not prejudicial. Instruction No. 2 is sandwiched between 1 and 3, in which the court submitted to the jury the issue as to whether or not the release was obtained through fraudulent representation made by the appellant's agents, and if the jury found for the appellee on the issue of liability, and also for the appellee on the issue of alleged fraud in the release, then they should consider certain elements in determining the amount of her damages. Instruction No. 2 was obviously meant to tell the jury that, if they found for the appellee on the other issues, then her damages should not exceed the sum which had already been paid her, unless the jury believed and found from a preponderance of the evidence that the sum already paid was not sufficient to compensate her for the damages which she had sustained. It tells the jury to deduct the sum already paid from any amount of damages which they found the plaintiff had sustained in excess of that sum.

The bill of exceptions, as corrected by *nunc pro tunc* order of the trial court, which order the court had a right to make, and which we must accept as the true bill, shows that no specific objection was made to instruction No. 2. *Freel* v. *State*, 21 Ark. 213; *Huffman* v. *Sudbury*, 128 Ark. 559-562. Such being the case, the court cannot consider the specific objection here urged to the instruction by the appellant. If the appellant desired that the instruction should cover the particular matters of which it now complains, it should have first drawn the attention of the trial court to these matters by specific objection. *St. Louis, etc., Ry. Co.* v. *Carter*, 93 Ark. 589. Appellant having failed to offer any specific objection to the instruction in the court below, under the general objection made to the instruction we can only consider such instruction to determine whether or not there are any inherent defects therein, and, if so,

whether, in the setting or connection which the instruction has in the charge as a whole, the giving of the instruction was prejudicial to the appellant. We are convinced that when the instruction (No. 2) is so considered in connection with instructions numbered 1 and 3, given at the instance of the appellee, and also with prayers of the appellant for instruction numbered 3 and 4, which were modified and given as modified, it was not calculated to mislead or confuse the jury. Instruction No. 2 was not prejudicial to the appellant. The charge as a whole was not contradictory, and fully submitted all the contested issues of fact to the jury. In *St. Louis, etc., Ry. Co.* v. *Rogers*, 93 Ark. 564-573, we said: "If, from the language used or the relation which the instructions are made by the whole charge to bear toward each other, it is readily seen that they are to be read together without conflict and as a harmonious whole, and they can be so read, then it is our duty to so treat them." Since the announcement of this rule in the above case, it has been consistently followed by this court in numerous cases. See *Miller Rubber Co.* v. *King*, 147 Ark. 302-308; *Yellow Rose Mining Co.* v. *Straight*, 133 Ark. 206-213; *St. Louis, etc., Ry. Co.* v. *Cobb*, 126 Ark. 225-230.

4. The appellant contends that the court's charge was defective because it in effect ignored the question of the defendant's liability for the derailment, and in effect directed a verdict for the plaintiff on that issue. At the conclusion of the testimony the appellant asked the court to instruct the jury to direct a verdict in its favor because, under the pleadings and the evidence, the plaintiff is not entitled to recover. The court refused this prayer, and in instruction No. 3, given at the instance of the appellee, told the jury, "if you find for the plaintiff, you will, in fixing the amount of damages, take into consideration the damages," etc. This instruction No. 3 was sufficient to submit the issue as to the liability of the appellant under the pleadings and all the testimony adduced. The appellant did not ask any more specific

submission on the issue of appellant's liability. The other instructions in the cause, given both at the instance of the appellee and the appellant, were on the issue as to the release and its effect on the appellee's alleged cause of action. The appellee alleged that she was a passenger on one of appellant's interstate trains, and that the same was derailed, and that she was thereby injured. The appellant admitted these allegations. The appellee proved the above allegations, and that was sufficient to carry the issue of liability to the jury, and, in the absence of any exculpatory evidence, justified the verdict of the jury in favor of the appellee on that issue. While the burden was upon the appellee to allege and prove the liability of appellant, she met this burden and established a *prima facie* case when she proved that she was a passenger on appellant's train and that the train was derailed, resulting in her injury. *Gleason* v. *Ry. Co.*, 140 U. S. 435-444; *Kelly* v. *Jackson*, 6 Peters 632. There is no error which calls for reversal of the judgment, and the same is therefore affirmed.