MISSOURI PACIFIC RAILROAD COMPANY *v.* ELVINS.

Opinion delivered March 26, 1928.

1. RELEASE—MISTAKE AS GROUND FOR RESCISSION.—A release of damages for personal injuries cannot be avoided on the ground of mistake, merely because the injuries proved more serious than the releasor at the time of executing the release believed them to be, even though his opinion may have been based upon that of the physician employed by the releasee to examine and report on the extent of his injuries.

2. RELEASE—INNOCENT MISREPRESENTATION BY RELEASEE'S PHYSICIAN.—Innocent misrepresentations of the releasor's injury made by the releasee's physician may be effective to avoid a release induced thereby.

3. RELEASE—EXECUTION UNDER A MUTUAL MISTAKE.—In an action by an automobile driver injured by being struck by a train while crossing the railroad track, brought after execution of his release, evidence *held* to sustain a finding that the settlement was made under mutual mistake of the parties as to whether the injuries were temporary or permanent.

4. RELEASE—RESCISSION—TENDER OF CONSIDERATION.—In an action to rescind a release obtained under mutual mistake as to whether the injuries were temporary or permanent, *held* that a tender of the consideration received was not a condition precedent to the maintenance of the action.

5. RELEASE—RATIFICATION OF SETTLEMENT UNDER MISTAKE.—In an action to rescind a release for personal injuries where plaintiff collected a draft given for such release after he had ascertained from an X-ray picture that there had been no union of bones in his leg, and that the injuries were probably permanent, *held* that collection of the draft did not constitute a ratification of the settlement.

6. RAILROADS—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—In an action by an automobile driver injured by being struck by a train at a railroad crossing, evidence *held* to sustain a finding that his injuries were occasioned by the negligence of the railroad company.

7. RAILROADS—INVITATION TO CROSS TRACK.—In an action by an automobile driver against a railroad company for injuries sustained by being struck by a train while crossing the track, where the flagman failed to raise his stop signal, *held* that there was an implied invitation to cross the track resulting from the flagman's action.

8.  DAMAGES—WHEN NOT EXCESSIVE.—A verdict of $18,500 for a broken leg, bones of which failed to unite, *held* not excessive, in view of Crawford & Moses' Dig., § 8575.

9.  EVIDENCE—JUDICIAL NOTICE—VALUE OF MONEY.—Courts and juries may take judicial notice that money today has much less purchasing power than it had 20 or even 15 years ago.

Appeal from Hempstead Circuit Court; *James H. McCollum*, Judge; affirmed.

### STATEMENT OF FACTS.

Jesse J. Elvins instituted this action in the circuit court against the Missouri Pacific Railroad Company to recover damages for personal injuries caused by the negligent operation of one of the defendant's passenger trains while he was driving over a public crossing in Hope, Arkansas. The defendant denied any negligence, and set up in bar of the action a release of all damages executed by the plaintiff.

The record shows that the plaintiff was injured while driving an automobile across a public crossing where the tracks of the Missouri Pacific Railroad Company cross Walnut Street, in Hope, Arkansas. Walnut Street is 36 feet wide between the curbs where it crosses the tracks of the Missouri Pacific Railroad Company in Hope. At that point the railroad runs east and west, and Walnut Street runs north and south. There is a large freight station to the right of the crossing, which obstructs the view of any one approaching the railroad tracks from the south. There is a house-track between the freight depot and the main track. North of the main line are several other tracks. There are stop-gates at the crossing, operated from a tower, but they were not in use on the day of the accident because they were out of repair. A flagman was stationed at the crossing, whose duty it was to hold up a stop flag when trains were approaching the crossing. Passenger train No. 5 was late on that day. The flagman had held up his stop sign for a passing switch engine. A. E. Holstead, who was approaching the crossing from the south

in an automobile, saw the switch engine on the north side of the main track, and stopped to let it pass over the crossing. Then he started up his automobile, and drove on across the track. He did not hear any warning of an approaching train by the ringing of a bell or the sounding of a whistle. The crossing watchman or flagman was on the north side of the track, standing with his flag down, talking to other persons. Other witnesses near the scene of the accident said they did not hear the warning of an approaching train by the ringing of a bell or the sounding of a whistle. They also testified that the flagman was standing with his flag down, and did not give any warning of the approach of a train.

According to the testimony of Jesse J. Elvins, the plaintiff, he drove up to the Walnut Street crossing of the Missouri Pacific tracks from the south, and stopped his automobile behind another car which had stopped for the crossing. The gates were open, and he heard no bell or whistle warning him of the approach of a train. He had some acquaintance in Hope, but was not familiar with conditions there. When he saw a man ahead of him drive across the track, he followed. He saw two men on the north of the track, but they did not hold up any stop sign. Just as the plaintiff drove across the first track on the main line, he saw that the train was right in his face, but could not avoid it. The train struck the automobile in which he was riding, and severely injured him. His leg was broken between the knee and the hip.

The plaintiff was carried to a hospital in Hope, and attended by Dr. J. H. Weaver, a resident surgeon at Hope for the Missouri Pacific Hospital Association. The plaintiff was kept in the hospital for about 30 days, with his leg in a cast. During this time the plaintiff talked with the claim agent of the defendant about settling his damages. Dr. Weaver measured his leg every day, and told him that there would be a good alignment of the

bones, and that there would only be a normal shortening of the limb amounting to one-half inch. Dr. Weaver told the plaintiff that he would not make an X-ray of his leg, because it might disturb him. He said that the bones had knit together in good alignment, and that he would be up in a couple of weeks and out of the hospital in less than 30 days. Relying on these representations, the plaintiff signed a release of all damages in favor of the railroad company for $3,500 and his hospital fees for 30 days. On the day after the settlement an X-ray picture was made of the plaintiff's leg, and it was ascertained that the bones had not united, and Dr. Weaver admitted to the plaintiff that he was responsible to the plaintiff for the condition of his leg. The plaintiff was then carried to Dr. Willis Campbell, at Memphis, Tennessee, and Dr. Campbell performed three operations on his leg. These operations were very painful, but did not cause the bones of the leg to unite. Subsequently an operation was also performed by Dr. Risner of Chicago. None of these operations were successful, and the plaintiff has to wear a brace on his leg to use it. He spent all the money received in settlement for treatment, and $800 more. The plaintiff was forty-four years of age, and had contracted a venereal disease while in the army, but had been pronounced cured. He would not have made the settlement if he had known that he was permanently injured. He relied upon the statement of Dr. Weaver to the effect that there would be a good alignment of the bones of his leg and that they had united.

Another witness who was present when the settlement was made corroborated the plaintiff as to the representations made by Dr. Weaver and as to the subsequent fact that the bones of the plaintiff's leg had not united.

According to the evidence of Dr. Willis Campbell, there was no approximation of the ends of the bones. A blood test showed that the plaintiff had had syphilis, and no union of the bones was obtained by the operations

performed upon him.  The bone showed no sign of syphilis when Dr. Campbell first examined him.  Sometimes bones fail to unite in persons who have not had syphilis, and sometimes the bones of persons with syphilis do unite.  According to the evidence of the witness, syphilis was the cause in the present case of the bones not uniting.  Witness said that he did not believe plaintiff would ever have a normal limb even with a successful bone graft operation.

According to the testimony of Dr. L. M. Lile, the leg of the plaintiff which was injured is of no use, and his injury is permanent.

According to the evidence adduced for the defendant, the bell of the passenger train was ringing and the whistle was sounding as it approached the Walnut Street crossing.  The engineer and fireman were both keeping a lookout, but were not able to stop the train after they saw the plaintiff attempting to drive over the crossing.  The flagman at the crossing testified that the gates were out of order, and that it was his duty to hold up a stop signal when a train was approaching the crossing.  He had held up his stop sign for a switch engine to pass over the crossing.  After the switch engine had passed, he lowered his signal and turned to talk to some persons who were near him. He had forgotten that the passenger train in question was late, and did not see it until it was right at the crossing. Other witnesses testified that the flagman had up his signal when the switch engine passed, and that he had it up just as the passenger train in question approached the crossing.

According to the testimony of Dr. J. H. Weaver, he examined the plaintiff after the accident, and found the right femur, the large bone running from the knee to the hip, broken in-two.  He put the plaintiff in a wire splint, with a weight extension on it to overcome the rigidity of the muscles.  The witness had set a great many bones, and was competent to perform that operation. He put the bones in place at the time he set it.  He had

three bricks for weights for the first ten days, and for the following ten days he had two bricks. Ordinarily he would expect results in twenty-five or thirty days to permit a removal of the splint. On the next morning after the injury he asked the plaintiff expressly if he had ever had syphilis, and the plaintiff told the doctor he had never had it. The splints were taken off at the end of four weeks, but this was not done with reference to the settlement. It was not necessary to take an X-ray before that time. The witness had been keeping measurements daily and regarded that as his guide. There was no indication of overlapped bones. After removing the splints he took an X-ray, and this showed that there was about one and one-half inch overlap in the bones. If there had been an overlap before the measurements, this would have been shown. If for any reason there is a non-union of the bones, when the splints were removed the contraction of the muscles would misplace the bone. The plaintiff did not lie quietly in bed, and would not leave his extension alone. He would raise up in bed and reach down and take the extensions off his leg. This might have prevented the bone from uniting. Another reason is that syphilis might have prevented the bones from uniting. The witness had nothing to do with the settlement. According to the testimony of this witness and of the claim agent, the plaintiff was anxious to make the settlement, and on several occasions tried to hurry it up.

In rebuttal the plaintiff denied that Dr. Weaver asked him if he had ever had syphilis, and said that if he had he would have told him that he had it while in the army.

The jury returned the following verdict: "We, the jury, find for the plaintiff, and assess his damages in the sum of $18,500, less credit of $3,500."

Judgment was rendered upon the verdict, and the defendant has appealed to this court.

*E. B. Kinsworthy* and *R. E. Wiley,* for appellant.

*Luke F. Monroe* and *Steve Carrigan,* for appellee.

HART, C. J., (after stating the facts). The main reliance of counsel for the defendant for a reversal of the judgment is that the plaintiff is bound by the release which he executed in favor of the railroad company. The release recites that, for the sum of $3,500, the plaintiff releases, discharges and receives full satisfaction of all damages for personal injuries growing out of the accident in question.

In 48 A. L. R. 1464, it is said that the general rule is that a release of damages for personal injuries cannot be avoided on the ground of mistake merely because the injuries prove more serious than the releasor, at the time of executing the release, believes them to be, and several Arkansas cases are cited. On page 1467 of the same case-note it is said that the rule is well settled, according to the great weight of authority, that a general release of a claim for personal injuries may, under proper circumstances, be avoided on the ground of mutual mistake as to the nature or circumstances of the injuries, and several Arkansas decisions are cited on page 1471 in favor of the rule. It is true that, where there is no misrepresentation or fraud on the part of the releasee, a releasor cannot subsequently avoid his release on the ground that his injuries were more serious than he had thought them to be, even though his opinion at the time of making the settlement may have been based upon that of a physician employed by the releasee to examine and report on the extent of his injuries. It is equally true, however, that an innocent misrepresentation of the releasor's injury, made by the releasee's physician, may be effective to avoid a release induced thereby. In the first type of cases the parties rely upon opinions and in the latter cases upon statements of existing facts.

In *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Hambright,* 87 Ark. 614, 113 S. W. 803, it was held that, if the chief surgeon of a railroad company fraudulently

represents to an injured employee that his injuries are slight and temporary, when they are serious and permanent, and this induces him to sign a release of the railroad company from damages, such release is not binding. It was also held that, if the chief surgeon of a railroad company in good faith represents to an injured employee that his injuries are slight and temporary, when they are serious and permanent, and thereby misleads him into signing a release of the railroad company from damages, such release is not binding.

Again, in *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Morgan,* 115 Ark. 529, 171 S. W. 1187, where, in an action for injuries to a railroad employee, there was evidence sufficient to warrant a finding that the physician or surgeon who treated the plaintiff at the hospital represented to him that he was not permanently injured, and that the settlement was induced by this statement, the court held that, even if this statement of the company's physician was made in good faith, the release was not binding if the injuries were not slight and temporary, as represented, but were serious and permanent.

In a later case, *F. Kiech Manufacturing Co.* v. *James,* 164 Ark. 137, 261 S. W. 24, it was held that, where a plaintiff, injured in the defendant's employment, signed a release, relying upon a mistaken opinion of the defendant's doctor that his injury was not permanent, he was not bound thereby, notwithstanding the release recites that he acted on his own judgment, and that no representations were made on which he relied.

In *St. Louis-San Francisco Ry. Co.* v. *Cox,* 171 Ark. 103, 283 S. W. 31, it was held that, where a release of liability was procured from a passenger injured in the derailment of a train, by means of false representations made by a surgeon connected with the railroad hospital, to the effect that her injuries were cured, when in fact they were not, the release was not binding.

In *Sun Oil Co.* v. *Hedge,* 173 Ark. 729, 293 S. W. 9, it was said that this court has frequently held that a release executed by an injured party, relying upon the mistaken opinion of the physician of the party responsible for the injury, that it was slight and temporary, and not permanent, is not binding upon the party making it.

Under the evidence in the case before us the jury was fully warranted in finding that the settlement was made under a mutual mistake of fact as to the nature and extent of the plaintiff's injuries. In fact, the undisputed evidence shows that the injuries to the plaintiff turned out to be permanent, when, at the time of the settlement, both parties thought they were only temporary. The physician of the defendant, who set the leg of the plaintiff and had him under his charge for about thirty days after the accident, told the plaintiff that the bones had been placed in good alignment and that they were united. It turned out that there had been no union of the bones, and that, as soon as the splint was removed, which was done on the next day after the settlement was made, the bones overlapped, and that, after successive operations by eminent surgeons, no union of the bones could be had. In the opinion of the physician, non-union was caused because of the bad condition of the blood of the patient resulting from syphilis, which he had contracted during the World War. According to the evidence for the defendant, its physician expressly asked the plaintiff, after the accident, if he had ever had syphilis, and the plaintiff replied that he had not. The plaintiff denied that the physician asked him this question, and said that he would have told him the facts if such question had been asked him. The jury found this issue in favor of the plaintiff, and the case stands as if no such question had been asked. It follows then that the undisputed proof shows that the settlement was made under a mutual mistake of the parties as to whether the injuries were temporary or permanent.

It is earnestly insisted, however, by counsel for the defendant that the release must stand because the plaintiff did not tender the consideration received by him before he instituted the present action. It may be conceded that this is the general rule laid down by the text-writers, but we are of the opinion that this court has adopted the contrary rule. The text-writers recognize that there is much confusion and doubt in the adjudicated cases bearing on the question. It is conceded that there need not be a return of the consideration where the settlement was induced by fraud, or when it was made at a time when the releasor was suffering great pain, or when he was under the influence of opiates; but it is contended that, where it was made and intended to be made by the parties, a return of the consideration should be made before bringing suit, even though the settlement was the result of a mutual mistake of the parties or of a mistake on the part of the releasor coupled with fraud on the part of the releasee.

In the case of *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Hambright,* 87 Ark. 614, 113 S. W. 803, it was argued that the court erred in entertaining the suit without the plaintiff having made a tender of the amount received in the settlement. The court held that tender was not necessary. It is now claimed that the court based its holding in this respect on the ground that the release was induced by fraud, because the plaintiff only thought he was making a settlement for doctor's bills, expenses and wages, and did not know that the element of compensation for his injuries entered into the settlement. It is true that this seems to be the reasoning of the court, but it will be remembered that the court also submitted to the jury the question whether the settlement was made under a mistake of fact, that both parties believed the injuries to be slight and temporary, when, in fact, they were serious and permanent, and that the plaintiff was thereby misled into signing the release. The court held that a tender of the consideration of the

release before suing was not necessary, and this was bound to apply to the question of mistake of fact as well as to the question of fraud in inducing the release.

This will be seen to be the reasoning of the court in *St. Louis, Iron Mountain & Southern Ry. Co.* v. *Morgan,* 115 Ark. 529, 171 S. W. 1187. In that case it was contended that the Hambright case could and should have been decided entirely on the question that the release was obtained by fraud, but the majority of the court based their views upon the decision of the law that, even if the settlement was not fraudulent, it constituted a mistake of fact which absolved the parties from the binding force of the contract. The court then quoted the syllabus on this phase of the case, and said that it correctly reflects the substance of the decision.

In the case of *St. Louis-San Francisco Ry. Co.* v. *Cox,* 171 Ark. 103, 283 S. W. 31, it was expressly held that, where a passenger was induced to sign a release of liability for personal injuries by a false representation, he is not bound, in this State, to return the sum had before suing to recover the damages sustained, though the injury was received and the release executed in another State, in which he would have been bound to make such return before suing, if his suit had been brought in that State. In that case the injury was received in the State of Missouri, and the settlement was made there. According to the evidence for the plaintiff, the release of liability was secured from her by means of false representations made by a surgeon connected with the railroad hospital, to the effect that her injuries were cured, when in fact they were not; and the court held that, under such a state of facts, the release was not binding, and no return of the consideration was necessary. Attention was called in the opinion to the Hambright case, and it was construed as a case holding that it is not a condition precedent to a maintenance of the action that the consideration for the release be tendered to the defendant before the action is instituted. In the Cox case the

court expressly said that, under our decisions, as reviewed in the opinion, a failure to return or make tender of the consideration for the release relates only to the remedy, and is not a matter of substance pertaining to the right of the action itself. Hence it was held that it was not necessary to return the consideration for the execution of the release as a condition precedent to the maintenance of the action. The court said that, in this jurisdiction, the failure of tender is a matter that does not reach to the basis of the right of the action itself, but is connected merely with the remedy.

There can be no difference in principle whether the release was the result of a mutual mistake of the parties or whether it was the result of a mistake on the part of the releasor coupled with fraudulent representations on the part of the releasee that the injuries were temporary, when in fact they were permanent. In each case the releasor signed the release because he relied upon the representations of the physician of the releasee, who told him that his injuries were temporary, when in fact they were permanent. The gist of the matter is that he signed the release believing that his injuries were temporary, when in fact they were permanent, and that he was induced to do this by the representations of the physician of the releasee stating matters as an existing fact, and not merely as his opinion. No good reason appears to us why there should be any distinction as to the restoration of the consideration in the two classes of cases. The decision in the Cox case is our latest enunciation on the subject, and, from the opinion, appears to have been made after a deliberate review of our former decisions by a judge who has been on the bench during the whole period of time when the subject has come up for consideration, and there does not appear to have been any dissenting voice from the decision. Therefore the decision in the Cox case will be taken as the rule governing cases of this sort in this State.

Again, it is insisted that there was a ratification of the settlement by the plaintiff because he collected the draft given him by the railroad company in settlement after an X-ray picture had been made and he had ascertained that there had been no union of the bones, and that his injuries were probably permanent. If we are correct in holding that the plaintiff was not required to return the consideration, there would seem to be no useful purpose to be served by him in refraining from collecting the draft. If he was entitled to receive the consideration, he might expend it for any necessary purpose and use it as a credit on his ultimate settlement with the railroad company. This was what the plaintiff said that he did in the present case. According to his testimony, which is not disputed, he expended the full amount of the release and in addition $800 in a vain attempt to secure a union of the bones in his injured leg by operations performed by eminent specialists. Hence we hold this assignment of error was not well taken.

On the subject of the negligence of the defendant but little need be said. In addition to the statutory presumption of negligence arising from the injury having been caused by the operation of one of the defendant's trains, it may be said that the great weight of the affirmative evidence shows that the injuries were caused by the negligence of the defendant. There was an implied invitation to cross the track resulting from the action of the flagman in failing to raise his stop signal. *Chicago, Rock Island & Pacific Ry. Co.* v. *Hamilton,* 92 Ark. 400, 123 S. W. 379; *Bush* v. *Brewer,* 136 Ark. 246, 206 S. W. 322; and *Mo. Pac. Rd. Co.* v. *Havens,* 164 Ark. 108, 261 S. W. 31.

It is next insisted that the court erred in failing to give an instruction requested by the defendant on contributory negligence. We do not think the court erred in refusing to give the instruction. The Legislature of 1919 passed an act providing, in substance, that in all

suits against railroads for personal injury or death caused by the running of trains in this State, contributory negligence shall not prevent a recovery where the negligence of the person so injured or killed is of a less degree than the negligence of the employees of the railroad causing the damage complained of; provided, when such contributory negligence is shown on the part of the person injured or killed, the amount of recovery shall be diminished in proportion to such contributory negligence. Crawford & Moses' Digest, § 8575. The instructions given by the court on the question of contributory negligence or comparative negligence were in accord with the construction of the statute by this court in *Missouri Pacific Rd. Co.* v. *Robertson,* 169 Ark. 957, 278 S. W. 357.

Finally, it is insisted that the judgment should be reversed because the verdict is excessive. We do not agree with counsel in this contention. There was a verdict of $18,500. The plaintiff was forty-four years of age at the time of the accident which caused him to have a fractured thigh bone. He was first carried to a hospital for about thirty days, and during this time suffered great pain. When the splint was removed from his leg it was found that the bones had not united, and he was compelled to undergo several operations in a vain endeavor to secure a union of the bones of his leg.. This he was unable to do, and his injury appears to be permanent. He lay in a hospital for many months while undergoing these operations, and suffered intense pain. He was a fruit and melon packer, and in that capacity earned $50 a week. He is not able to do that work any more, because it necessitates his standing on his feet. He has expended more than $4,300 in hospital bills and expenses. The great weight of the evidence tends to establish that the defendant was negligent and that the plaintiff was not guilty of contributory negligence.

Under these circumstances we do not think that it can be said that the verdict of the jury was the result

of passion or prejudice, and so excessive. We are asked to make a comparison with other cases, and have examined many cases with a view of determining whether or not it is excessive, but no useful purpose could be served by reviewing the cases in this opinion.

Especial reliance is placed on the case of *Aluminum Company of North America* v. *Ramsey,* 89 Ark. 522, 117 S. W. 568, where the plaintiff suffered an injury to one of his legs, resulting in amputation and a verdict for $20,000, which was reduced by the court to $12,000. It is true that in that case the injured person was only twenty-two years of age, while in the present case the plaintiff is forty-four years old. The earning capacity of Ramsey was $2.40 per day, while Elvins was capable of earning $50 per week as a fruit-packer. Ramsey's medical bill and hospital fees only amounted to $386.22. Elvins has already spent more than $4,300, and has suffered intense pain throughout a period of many months.

In *Boyle-Farrell Land Co.* v. *Haynes,* 161 Ark. 183, 256 S. W. 43, a laborer 35 years old, earning $2.25 a day, sustained permanent injuries by his leg being shortened and its use almost totally impaired, and in addition will continue to suffer pain and be disfigured for life, and a verdict for $18,500 was held not to be excessive.

In *Zumwalt* v. *Chicago & A. R. Rd. Co.* (Mo.); 266 S. W. 717, the Supreme Court of Missouri upheld a verdict for $18,500 damages for a compound fracture of the leg, which, evidence indicated, might never heal properly.

In *Gulf, C. & S. F. Ry. Co.* v. *Crow* (Tex. Civ. App.), 220 S. W. 237, the Court of Civil Appeals of Texas upheld a verdict for $18,000 to a railroad engineer, where he was thirty-two years of age, the injury consisting of an oblique fracture of the thigh bone resulting in a shortening of the leg.

In *Hurst* v. *Chicago, B. & Q. R. Co.,* 280 Mo. 566, 219 S. W. 566, 10 A. L. R. 174, the Supreme Court of Missouri held not to be excessive a verdict of $15,000 to a railroad

conductor for the loss of his leg below the knee by an accident which caused him great pain and suffering, and where his earning capacity was reduced from $150 to $20 per month.

In this connection it may be also stated that the jury may consider to some extent that money today has much less purchasing power than it had twenty or even fifteen years ago. This is a matter of common knowledge to all, of which courts and juries may take judicial notice. On this point see notes to 18 A. L. R. 564, 10 A. L. R. 179, and 3 A. L. R. 610.

We find no prejudicial error in the record, and the judgment will therefore be affirmed

SMITH, J., dissents.