J. R. BROWDER *v.* K. E. GAHR

75-157                                      530 S.W. 2d 359

Opinion delivered December 15, 1975

*Wright, Lindsey & Jennings,* for appellant.

*Skillman, Durrett & Davis,* for appellee.

CARLETON HARRIS, Chief Justice. This personal injury action arose from an altercation in the polling place at Turrell, Arkansas, at the close of election day. Appellant, the then Sheriff of Crittenden County, injured appellee while the

latter was being arrested, and appellee obtained a judgment for $30,000. From the judgment so entered, appellant brings this appeal, arguing only that the amount of the judgment is excessive.

Appellee, K. E. Gahr, was an election judge at the Turrell polls in a runoff between appellant and R. L. Simmons on June 11, 1974. Two of appellant's deputies, R. C. Smithey, and Charles Walker, according to the evidence, were in and about the area all during the day. Following closing of the polls, Mrs. Faye Droke, appellant's designated poll watcher, stated that the box was being challenged by appellant, and Deputies Smithey and Walker then came in as Mrs. Droke handed the written challenge to poll officials. Smithey and Walker were requested to leave the premises since they did not have poll watcher's permits. According to witnesses for appellee, Smithey refused to leave, and Alvin Fraley, officer of the day at the polls, and Ricky Stalls, township constable, then placed their hands under Smithey's arms, lifted him up and carried him out the door.[1] Appellee testified that Walker grabbed him and he struck Walker in the mouth.[2] After the deputies were removed from the polling place, the doors were locked and the election judges and clerks proceeded with their duty of counting the ballots, but within a short time, the back door was apparently forcibly opened by the sheriff and several deputies who entered the room. It is not clear as to exact subsequent events, other than the fact that Gahr and Stalls were placed under arrest for assaulting the deputies. The sheriff testified that he told Smithey to arrest those who had assaulted him, while all bystanders who were not deputies, stated that the sheriff made the arrests. At any rate, according to appellee, one of the deputies placed handcuffs on his right hand, the sheriff choked him,[3] and Deputy Akers hit him in the stomach with a long nightstick.

[1]Smithey testified that he was not asked to leave; that somebody simply said, "Throw them out." He said when he was taken to the outside that one, "Stomped me and kicked me." He said he was injured, though persons standing outside said that he was not attacked.

[2]Walker said that Stalls hit him in the mouth.

[3]The sheriff stated that Gahr took a "swing" at Deputy Butts, "started swinging with his right hand and kicking***." He said when this happened, "I got him with an armlock and held him until Butts got the cuffs on him."

Jerry Ray Akins testified that the sheriff was choking Gahr, and that he (Akins) was telling the sheriff while this was going on that Gahr had had a serious operation, "He was dragging him back towards the door, which he burst in, and he had him bent back over backwards ***;" that the sheriff finally let go of appellee, who then fell to the floor. The witness said that Akers poked Gahr in the stomach with a nightstick. Akins stated that after Gahr "started coming to, Sheriff Browder walked back over to where he was and said, 'We are going to get you,' or something you know."

Carl Miller testified that:

"A deputy by the name of Butts walked over and caught ahold of Gahr's arm and twisted it behind him and put the handcuffs on him, and when he done that, the Sheriff put his arm around his neck, choking him, and, of course, he was standing up there and they about choked him unconscious, and then Mr. Akers started to punching him in the stomach with a nightclub out there."

He said that by that time, Gahr was unconscious, and that he told the sheriff, "You done killed him."

The testimony of John B. Cage was in the same vein and he added, "The ladies there were asking him not to do it, said he had had an operation, choking him to death and all of that ***."

Thereafter, Gahr instituted suit against Browder and Akers, obtaining the judgment for $30,000 against the sheriff, and a judgment of $150.00 against Akers.

As earlier stated, appellant does not question the substantiality of the evidence to support a judgment, but it is insisted that the verdict was excessive, and appellant's principal argument is based upon the testimony of Dr. John E. Robinson, Jr., a general surgeon of Memphis. Dr. Robinson had first examined Gahr on November 23, 1973, for evaluation of an intractable duodenal ulcer and associated pancreatic tumors, and Gahr underwent surgery for this condi-

tion and his stomach was completely removed. One month after this operation, Gahr developed an intestinal obstruction which was removed in February, 1974. In March, 1974, appellee underwent surgery for a hyper-parathyroid condition.

Robinson examined Gahr on the night of the assault, finding tenderness around the incision, but no other external signs of trauma. He did not think that the trauma aggravated any existing condition, although he did feel that Gahr would have had more discomfort from physical abuse received in the abdomen than someone who had never had surgery in that area. The witness mentioned that in September, 1974, Gahr underwent another abdominal operation for continued vomiting of bile, but the doctor said this was a pre-existing condition. However, he added that the vomiting "had been resolved by a change in his diet up until the time of this alleged beating." Dr. Robinson also said that looking at the emotional aspects of the trauma, an ulcer patient's condition would be aggravated; "Ulcer patients are very emotional and high strung, as a rule." Appellant points out that the total medical expense, "some of which may not have been attributable to the injuries he received at Turrell was $337.85."

It is also contended that since the injuries based upon the actions of Deputy Akers were compensated by the jury in the amount of $150.00, the balance of the award was to compensate for the "armlock" or choking action taken by the sheriff. We do not find this contention tenable. Unquestionably, it was the view of the jury that the sheriff had control of Akers and, by a word, could have prevented the assault by the deputy; indeed, the evidence reflects that the sheriff had charge of the entire operation.

As to damages suffered by appellee, it is argued that no effort was made to show that any time was lost from work, or that Gahr's activities had been limited in any way by his injuries and that accordingly, "the sum of $29,662.15 was awarded by this jury for Mr. Gahr's pain and suffering and nothing more."

We cannot agree with the above statement. It might first be mentioned, however, that Gahr detailed quite a bit of

physical suffering himself, complaining of pain in his neck, tenderness around his abdominal scars, abdominal pain, and soreness of his body. Within a week after the assault, according to Gahr, there was a recurrence of frequent vomiting after meals, a condition which had been alleviated prior to the assault, and he testified of pain in his lower neck and jaw. Appellee subsequently underwent an additional operation to cure the recurrent vomiting. Let it be remembered that the evidence also reflected that Gahr had undergone surgery for a thyroid condition less than three months before the assault, the thyroid gland being located at the base of the neck.

Of course, had appellee sought punitive damages, the entire amount awarded by the verdict would likely be quickly upheld, for the conduct of the sheriff, under the testimony of the witnesses, cannot be justified in any manner. Browder, a public officer, entrusted by the public to safeguard the rights of its citizens, was six feet tall and weighed two hundred and fifteen pounds,[4] and though the sheriff testified that he only used so much force as was necessary in making an arrest, it would not appear a matter of necessity that he choke Gahr, who was five feet five inches tall and weighed one hundred and twenty-five pounds, into unconsciousness.

As earlier stated, we cannot agree that the award was made simply on the basis of Gahr's pain and suffering. The jury was instructed as to mental anguish, and this is an important element of damage. In 6 AM. JUR. 2d *Assault and Battery* § 183, it is pointed out that the prevailing view is that in an action for an assault and battery, damages for mental suffering may be recovered even though the plaintiff received no physical injury.[5] Further:

> "Mental suffering reasonably certain to be endured in the future may be taken into account in estimating the amount of damages to be awarded. Other elements that may be taken into consideration in determining such damages include the affront to the plaintiff's per-

---

[4] Deputy Akers was five feet eleven inches tall and weighed two hundred forty pounds.

[5] See *Erwin v. Milligan*, 188 Ark. 658, 67 S.W. 2d 592, where we held that when the tort is intentional, damages for mental anguish are recoverable without physical harm.

sonality, and the indignity, disgrace, humiliation, and mortification to which he was subjected by the defendant's conduct.

"In an action for assault or battery, damages for mental suffering are usually allowed as compensatory damages."

This reasoning was followed in the Tennessee case of *Garner* v. *State ex rel. Askins*, 137 Tenn. App. 510, 266 S.W. 2d 358 (1953), where the sheriff and his deputy held the victim while a constable beat him with a blackjack in the course of arresting him for reckless driving. There, the trial court granted a remittitur from $4,050 to $750.00, stating that the plaintiff wasn't hurt, "just his feelings." The appellate court reversed, restoring the judgment to the full amount originally awarded by the jury and stated:

"Plaintiff was entitled to recover compensation for all his injuries - those already suffered and those he is reasonably certain to suffer - including an allowance for his physical pain and mental anguish, for the affront to his personality, the indignity, disgrace, humiliation and mortification to which he was subjected by the conduct of this peace officer.

"It is true that there are no set rules for determining the amount of damages which a plaintiff is entitled to recover for the wrongful conduct of an officer in a case like this. There is a wide range of variation in amounts in cases more or less similar, but there are numerous cases more or less similar to this in which there were larger judgments than the amount originally fixed by the jury in this case."

There are no Arkansas cases which deal specifically with the element of mental anguish in an assault and battery case and we thus have no precedent for a guide in the present litigation. As stated by the court in *Garner*, there are really no set rules for determining the proper amount of damages in a case of this nature, but it is evident from the testimony herein set forth that a jury could find that Gahr suffered not only in-

tense physical pain, but deep mental anguish through worry, humiliation, and mortification occasioned by the attack upon him. Certainly, a jury could have found from the evidence of Dr. Robinson and Gahr that the frequent vomiting by appellee had been resolved prior to the assault; that the additional operation to correct this condition subsequent to the assault, had been occasioned by the sheriff's attack upon Gahr. Of course, worry over what effect the injuries inflicted could have on his general physical condition, including the possibility of further surgery, could create considerable mental anguish. A jury could find that the embarrassment and humiliation of being choked and beaten in front of one's friends and acquaintances, as well as being handcuffed like a common felon, by the very nature of these acts, would occasion extreme anguish. How does one measure financial indemnity for this type of damage? What figure properly compensates for such a humiliating and ignominious experience? There can be no set standard.

In *Turchi* v. *Shepherd*, 230 Ark. 899, 327 S.W. 2d 553 (1959), this court said:

"A comparison of awards made in other cases is a most unsatisfactory method of determining a proper award in a particular case, not only because the degree of injury is rarely the same, but also because the dollar no longer has its prior value. Even as far back as 1928, in the case of *Missouri-Pacific Railroad Company* v. *Elvins;* 176 Ark. 737, 4 S.W. 2d 528, this Court said:

'In this connection it may be also stated that the jury may consider to some extent that money today has much less purchasing power than it had twenty or even fifteen years ago. This is a matter of common knowledge to all, of which courts and juries may take judicial notice.'

"Certainly, it is a matter of common knowledge that today's dollar has greatly diminished in value during the past several years."

If, in 1959, it was a matter of common knowledge that the dollar had greatly diminished in value during the "last

several years," then it is certainly common knowledge that that statement is undoubtedly even more true today.

We have concluded that the award, considering all of the elements mentioned, pain and suffering, anxiety over possible physical complications that might arise, embarrassment, humiliation, etc., support a generous award — but punitive damages not being involved — not so generous as awarded by the jury.

Accordingly, the judgment is reduced to the sum of $20,-000. If, therefore, within seventeen calendar days, the appellee will enter remittitur for damages in excess of $20,000 the judgment will be affirmed. Otherwise, the judgment will be reversed and the cause remanded.

FOGLEMAN, J., not participating.