[Civ. No. 6026. Third Appellate District.—May 24, 1939.]

BENJAMIN H. CRABTREE, Respondent, v. THE WEST-
ERN PACIFIC RAILROAD COMPANY (a Corpora-
tion), Appellant.

Jerome D. Peters, Seth Millington and C. W. Dooling for Appellant.

Clifton Hildebrand, Albert M. King and Goodman & Brownstone for Respondent.

THOMPSON, J.—The defendant has appealed from a judgment of $10,000 which was rendered against it in a suit for personal injuries sustained by plaintiff while he was engaged in washing out the boiler of an engine in the roundhouse at Oroville. The company owns and operates a railroad business which involves interstate commerce. This suit was instituted under the Federal Employers' Liability Act. (Title 45, U. S. C. A., Railroads.) The cause was tried with a jury. Defendant's motion for a judgment notwithstanding the verdict, pursuant to section 664 of the Code of Civil Procedure, was denied. A motion for new

trial was also refused. From the judgment and from these orders the defendant has appealed.

Among the properties and equipment owned and used in the defendant's railroad enterprise is a roundhouse located at Oroville, California, where locomotive engines are cleaned and repaired. The plaintiff, who was an able-bodied man six feet in height and 46 years of age, had been employed by the company as a laborer in that roundhouse for eleven years. At the time of the accident he was engaged in washing out the boilers of engines. This was done by first removing certain plugs which permitted the water to drain from the boilers. There are also four washout plugs located above the running boards on either side of the boilers. The running boards extend along both sides of the boiler from the cab to the front of the engine. They are constructed of steel 14 inches in width and are located eight feet and four inches above the ground. About four feet above the running boards a hand-rail is fastened to the boiler and extends full length and parallel therewith. The cab at the rear end of the locomotive connects with the boiler and contains the levers and apparatus for operating the engine. The cab is constructed the entire width of a car and extends beyond the boiler on either side a distance of about one foot and a half. The engineer's cab is provided with open windows on both sides. Above and below these windows and along the lower outside edges of the cab there are parallel hand-rails extending its entire length. A tender car is attached immediately back of the engine. The front of the tender is equipped with steps to enable the engineer and fireman to enter the cab. Vertical hand-rails are fastened to both the front of the tender and the rear of the cab. Upon some of the engines vertical hand-rails were also attached to the front of the cabs as safety devices to which workmen could cling in passing from the cab to the running boards in the performance of their duties. Engine number 203, upon which the plaintiff was employed at the time of his accident, did not possess these last-mentioned rails. Most of the engines lacked them. Beneath the cab and above the rear wheels, foot-plates or steps extend on either side of the engine to enable workmen to mount the running boards from the ground.

In removing and replacing the washout plugs in the boilers above the running boards, and in flushing the boilers by means of forcing water with a hose into those openings, the boilermen were accustomed to climb through the cab windows, standing upon the lower foot-rails and working their way to the front of the cab. While clinging to the upper rail they would step up and stand upon the running boards to perform their work.

The plaintiff was employed as a hostler or washer of boilers at the roundhouse from 4 o'clock P. M. of each day until midnight. March 4, 1935, on which day the accident occurred, was cloudy and the sun went down at 6:15 o'clock in the evening. The boiler of locomotive number 203 was washed and the engine had been groomed and greased. It was then the duty of the plaintiff to replace the washout plugs above the running boards. He testified that it was a dark and cloudy day; that it was dusk and difficult to see clearly in the roundhouse when he attempted to mount the running board. He climbed through the window of the cab at 4:45 P. M. for the purpose of replacing the plugs as he had previously done hundreds of times. With wrench in hand, he walked on the foot-rail at the bottom of the outside of the cab and clung to the rail above the window. When he reached the front of the cab he raised his right foot and placed it upon the running board, at the same time reaching for the hand-rail above it. When he placed his weight upon that foot to elevate himself to the board, it slipped and he grasped for the vertical hand-rail in front of the cab, which, in the emergency, he assumed was there, but finding it missing, he fell to the ground, fracturing the heel-bone or os calcis of his left foot at the point where it articulates with the lower end of the tibia. The ligaments of the foot were torn. He also sustained an injury in the nature of a hernia. As a result of the fracture he suffered a fallen arch and permanent disability of the left foot from lack of mobility. There exists a tendency to deformity of the foot and danger of subsequent arthritis.

In falling from the running board the plaintiff struck with his full weight on his left foot and then toppled over upon his back. He lay on the ground a moment, not realizing that he was seriously injured. His ankle did not at first pain him. As he rose and sat there he noticed a large gob

of grease protruding from the sole of his right shoe. He testified that it was nearly the size of his fist; that he picked up some waste cotton and wiped it from his shoe; that he then stood upon his feet and being curious regarding the source from which the grease came, he stepped upon the foot-plate over the rear wheel of the engine, and reaching up he ran his hand over the edge of the running board in the locality from which he slipped; that as a result thereof his fingers were covered with grease and oil; that he then wiped the grease from the running board with the waste which he held in his hand and threw it away. When he fell from the board he dropped his wrench, which was later found beneath the cab window. He said that before he stepped upon the running board, he glanced down and saw no grease. There is evidence that another workman observed the running board a few moments before the accident occurred and he saw no grease upon it. No grease was found upon it when the washout plugs were replaced half an hour later.

After wiping the running board the plaintiff got down from the plate upon which he stood, and stepping upon his left foot he discovered that it pained him greatly. He then thought that he had sprained his ankle. He climbed into the cab and sat there for about ten minutes, intending to return when the pain ceased and replace the washout plugs. The pain in his foot increased greatly and the ankle soon began to swell. Observing two fellow workmen near by, he called them to come to his aid and merely told them he had fallen from the running board and hurt his ankle. They finally lifted him from the cab and carried him in a wheelbarrow to the office, where he changed his clothes and was taken to his home in an automobile. Medical aid was promptly rendered. In due time he moved about by means of crutches. The left foot is permanently injured. This suit for damages was commenced in July, 1936. It is not contended the award of damages is excessive.

Only two issues are raised on this appeal. It is contended the verdict and judgment are not supported by credible evidence and that the plaintiff is precluded from recovering damages for his injuries by the doctrine of assumption of risk incident to his employment. Regarding the asserted absence of evidence to support the judgment the appellant says:

"We ask the court to disregard the testimony of the respondent because it is unsubstantial, unbelievable and fabricated to meet the occasion."

While it is true that only credible testimony may be considered on appeal in support of a judgment, and that evidence which is inherently improbable or clearly false will be disregarded, it is usually the sole province of the jury to determine the credibility of witnesses and the weight and sufficiency of the evidence. In spite of circumstances which may be open to serious criticism or justifiable suspicion, in accordance with the established rule controlling the consideration of an appellate tribunal, we are precluded under the facts of this case from substituting contrary conclusions, even though we possessed them, for the judgment of the jury in rendering its verdict and for the opinion of the trial judge in denying the motions for a judgment notwithstanding the verdict and in refusing a new trial. Without clear and convincing evidence disclosed by the record we are not authorized to overrule the judgment of the jury and the trial judge with respect to the credibility of the plaintiff or the truthfulness of his testimony to the effect that he slipped upon a lump of grease which some other workman had evidently dropped upon the running board, and fell to the ground. His failure to first mention that fact is susceptible of plausible explanation which may have controlled the jury and the trial judge in their conclusions. Even though reasonable minds may differ regarding that omission in the beginning, we are not at liberty to upset the verdict and judgment on that account.

The appellant strenuously asserts that the plaintiff fabricated his story about stepping on a lump of grease on the running board as a last resort to save himself from defeat when his first cause of action based on the absence of a verticle hand-rail in front of the cab was effectively destroyed by proof that most of the engines did not have them installed. Appellant insists that the plaintiff "never complained of any such gob of grease being on the running board" until after the taking of his deposition within one week of the trial. In that statement the appellant is in error. In the second cause of action contained in the complaint, which was filed a year before the trial, the plaintiff

specifically alleged that the accident occurred from slipping on grease and oil negligently left upon the running board. That theory was evidently not conceived after the taking of the deposition.

It is true that the first cause of action was based on the theory that the company was guilty of negligence in failing to provide the plaintiff with a reasonably safe place at which to work by neglecting to attach the vertical handrails to the front of the cab on engine number 203, which would have saved him from the fall if they had been so installed. It is also true that the plaintiff testified he was of the impression most engines contained that rail, and that, in the emergency, when he slipped on the running board, he grasped for that rail, but finding it missing, he fell to the ground. When evidence was adduced that only a few of the engines possessed those verticle rails in front of the cab, and a motion was made for a nonsuit of the action as to that count, it was dismissed by the plaintiff, and he was then compelled to rely solely on his second cause of action.

The second cause of action alleges that:

"Prior to plaintiff's going upon the said running board, defendant, through its servants, agents and employees, other than plaintiff, had carelessly and negligently deposited upon and left upon the said running board, a large quantity of grease, and had carelessly and negligently failed and neglected to remove the same. That the presence of said grease on the said running board was unknown to plaintiff, and when plaintiff stepped upon the said running board in the performance of his duties, he slipped upon the said grease and fell from the said running board to the ground, and as a proximate result of the carelessness and negligence of the defendant, its agents, servants and employees, plaintiff suffered the injuries herein enumerated.''

The plaintiff did not assume the risk of his employment under the circumstances of this case so as to preclude him from recovering damages for injuries sustained from slipping upon grease deposited and left upon the running board by the negligence of a fellow servant, unless he knew, or by the exercise of reasonable care should have known that it was there. A railroad employee, working for a company engaged in interstate commerce, does not assume the

risk of the negligence of a coworkman regarding whose careless acts he has no knowledge, unless as a reasonably prudent person under similar circumstances he would be presumed to have observed and appreciated them. (Title 45, U. S. C. A., p. 378, sec. 52, and note, p. 463; *Erie Ry. Co.* v. *Purucker,* (Ohio) 244 U. S. 320 [37 Sup. Ct. 629, 61 L. Ed. 1166] ; *Montgomery* v. *Baltimore & O. R. Co.,* 22 Fed. (2d) 359; *Chapman* v. *United States Express Co.,* 192 Mich. 654 [159 N. W. 308].)

It is said in that regard in *Gila Valley G. & N. Ry. Co.* v. *Hall,* 232 U. S. 94 [34 Sup. Ct. 229, 58 L. Ed. 521], that:

"An employee assumes the risk of dangers normally incident to the occupation in which he voluntarily engages, so far as these are not attributable to the employer's negligence. But the employee has a right to assume that his employer has exercised proper care with respect to providing a safe place of work, and suitable and safe appliances for the work, and is not to be treated as assuming the risk arising from a defect that is attributable to the employer's negligence, until the employee becomes aware of such defect, or unless it is so plainly observable that he may be presumed to have known of it."

██ In the present action the plaintiff established a *prima facie* case of negligence on the part of some coemployee in leaving a lump of grease on the running board. It was not necessary for him to prove just who dropped that grease upon the board. It does appear that the locomotives, including engine number 203, were washed, groomed and greased in that roundhouse by employees of the defendant other than the plaintiff, before it became his duty to replace the washout plugs. It also appears that it was the duty of the other workmen to wipe off surplus grease and leave the running board clean. This is not disputed by the defendant. The case was tried on that theory. The only defense to that charge of negligence was an effort on the part of the defendant to prove that no grease was left on the board. Witnesses were called to show that fifteen minutes before the accident occurred and half an hour afterward the board was free from grease. In the absence of proof of a habit of workmen to leave grease on the running boards, a fellow servant may not be presumed to anticipate that dangerous practice. ██ While it is true that a servant employed in an interstate commerce industry does assume all normal risks incident to his particular task which

are actually known to him, or which, in the exercise of ordinary care by a prudent person under similar circumstances, are reasonably ascertainable (45 U. S. C. A., p. 448, sec. 24), he is not precluded from recovering damages for negligence of a fellow servant who carelessly leaves a large lump of grease on a running board, which the rules and custom of the company require to be kept clean and free from such dangerous, slippery substance, when the plaintiff relies upon that custom and looks at the board before stepping upon it, but fails to discover the grease because of existing shadows or prevailing dusk. There is sufficient evidence in this case to show that the grease was left upon the board by a fellow servant and that the plaintiff did not assume that risk as a necessary incident to his employment.

We do not think the evidence of the plaintiff is inherently improbable. We must construe his testimony in support of the judgment according to the prevailing rule. It does not seem to be improbable that the plaintiff at first thought he was not seriously injured, and upon the contrary that he had merely sprained his ankle. He said that he climbed into the cab and sat for ten minutes on the engineer's seat waiting for the pain to abate, intending to go back and replace the washout plugs; that when the pain continued and he observed the rapid swelling of his ankle, upon seeing his fellow workmen, Howard Gaskins and Louie Torasso, near by, he hailed them and said he had "slipped and fell and hurt my foot". It does not seem unreasonable that he did not then discuss the details of the cause of his accident. He was asked nothing about it at that time. He was anxious to have his duty of replacing the washout plugs performed. Gaskins said "Well I will go ahead and put the plugs in and you sit there awhile and maybe you will get better". It is not true that the plaintiff neglected to mention the grease as the cause of his accident during the taking of his deposition on Thursday preceding the trial. In the course of his deposition the plaintiff stated that his foot slipped from the running board on account of the presence of grease and oil. When he attempted to explain that matter in further detail, he was interrupted by the attorney for the defendant, and was not further interrogated in that regard. On cross-examination of the plaintiff at the trial the following occurred:

"Q. Do you know why your right foot slipped? A. It was grease and oil. Q. Where was the grease and oil? A. When I felt— Q. (interrupting). I did not ask you that . . . Q. Where did you get the grease and oil that was on your foot? A. I don't know, it evidently came from the running board. Q. Which running board? A. The iron one. . . . Q. Why didn't you say then that you knew it was on the running board, didn't you know that Thursday, that that big gob of pin grease was on the running board? A. Yes sir. . . . Q. Why did you say that you did not know? A. When you interrupted me there— Q. (interrupting) Pardon me now. . . . Q. And you not only had the opportunity to look for that running board and observe it carefully, but you actually did do that? A. Yes, sir. Q. And you saw no grease of any kind on it at all? A. No sir I did not, I didn't see any grease at all."

It clearly appears the plaintiff positively asserted at the taking of his deposition, that he found a lump of grease on his shoe after the accident occurred, and that he thought it came from the running board. This confirms the claim in that regard which is alleged in his complaint filed a year before the trial of the cause. The defendant may not complain of a failure to explain that incident in greater detail since the plaintiff was apparently twice interrupted at the critical time and prevented from doing so. The later portion of the above-quoted evidence may not be reasonably construed to mean that the plaintiff previously admitted he found no grease on the running board after the accident occurred. There is no irreconcilable conflict in his evidence in that regard. What he evidently meant from the foregoing quotation is that before he stepped on the board, *prior to the time of the accident*, he looked and saw no grease upon it. That statement had no reference to his finding the grease and oil on the running board when he ran his fingers over it after the accident at the time when he found the grease on the sole of his shoe. He explained that the reason why he did not see the grease on the board before he stepped upon it, was that it was a cloudy day and dusk in the roundhouse at that time. There was a conflict of evidence in that regard. It was, however, the sole province of the jury to reconcile that

46

conflict and to determine the credibility of the various witnesses.

The written statement of the witnesses Gaskins and Torasso which was offered in evidence adds nothing to the weight of their testimony. It merely reiterates the statement that when the plaintiff called them to him and said: "I slipped and fell down and hurt my foot." It does not appear that the cause of his accident was then further discussed. It does not seem strange that the plaintiff who was then suffering pain and anxious to have the washout plugs installed, since that was a part of his duty, should not have considered or discussed at that critical moment the immediate cause of his slipping from the board. It is not unreasonable to believe that one in the stress of a serious accident who is suffering pain, should not forthwith calmly sit down and analyze the exact cause therefor. That sort of deliberation usually takes place subsequently.

 It was also the exclusive province of the jury to determine the weight to be given to the two written statements of the plaintiff which were subsequently procured by agents of the company. We may not be permitted to say the plaintiff was unworthy of belief merely because those statements do not contain the exact declaration that he fell from the board as a result of stepping on grease which was negligently left there. He testified that Mr. C. M. Hickok was sent to him as an agent of the company three days after the accident occurred to procure a written statement from him; that he then told him "the company would take care of him"; that the statement was taken on a form consisting of routine questions which were previously prepared by the company; that he was in bed at that time and unable to write; that Hickok read the questions to him and wrote down the answers; that the prepared form contained among other questions the following: "If a person or thing slipped, fell or dropped, . . . state fully and in detail the cause thereof", to which he replied: "I told him that I had stepped in some grease and slipped and didn't go into detail"; that Hickok merely wrote the following: "Lost balance account might have been something on bottom of shoe." The plaintiff said that he signed that statement without reading it. He assumed Hickok had written the answers to the questions as he gave them to him. The variance

in those answers may not have seemed important. It was the province of the jury to determine whether, under the circumstances under which this statement was taken, the agent of the railroad company had correctly written down the plaintiff's answers to the questions.

There is a conflict of evidence regarding the presence of a quantity of grease on the running board and the ability of the plaintiff to have seen it on account of the insufficiency of light. There are also some inconsistencies in the testimony of several witnesses. We are aware of the fact that inaccuracies frequently occur in the testimony of perfectly honest and conscientious witnesses. Many of these inconsistencies may be reasonably accounted for. After carefully reading the entire transcript we are unable to say the plaintiff was not worthy of belief or that his story of the presence of the grease was inherently improbable or false.

 Upon motion for a new trial the affidavits of four jurors, offered for the purpose of impeaching their verdict, were stricken from the record. That motion was properly granted. The verdict was rendered by a nine to three vote of the jurors. At least one of the four affiants voted in favor of the verdict which was returned against the defendant. He averred that, in spite of the verdict which he had rendered against the defendant, that he believed the company was not guilty of negligence which contributed to the plaintiff's injuries, but that he agreed to the verdict only because he thought the plaintiff sustained his injuries in the course of his employment and that "he should receive some compensation for his injuries".

 The appellant contends this inconsistent conduct on the part of jurors constitutes "irregularities in procedure" so serious as to render the verdict void, necessitating the reversal of the judgment for failure to grant a new trial on that ground. We think not. On their *voir dire* the jurors swore they would render their verdict solely on the facts presented at the trial and upon the instructions of the court. The court charged the jury that the burden was upon the plaintiff to prove the negligence of the defendant as charged in the complaint by a preponderance of the evidence, and that upon his failure to do so, they were absolutely precluded from finding a verdict against the defendant. To permit a juror to stultify his oath and his

verdict in that manner would defeat the very purpose of the wholesome rule adopted in the interest of public policy. It would subject jurors to perverting influences after the restraint of the court had been removed, and tend to defeat justice. It is therefore the uniform rule in this and other jurisdictions to reject affidavits or oral evidence of either concurring or dissenting jurors which tend to contradict, impeach or defeat their verdict, except to show that the verdict was secured by chance as distinguished from the independent judgment of individual jurors. (*Saltzman* v. *Sunset Tel. & Tel. Co.*, 125 Cal. 501 [58 Pac. 169]; *Toomes* v. *Nunes*, 24 Cal. App. (2d) 395 [75 Pac. (2d) 94]; sec. 657, subd. 2, Code Civ. Proc.; 24 Cal. Jur. 877, sec. 126; 97 A. L. R. 1038, note; 6 So. Cal. Law Rev. 246.)

The judgment and the order denying motion for judgment notwithstanding the verdict are affirmed.

Tuttle, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on June 23, 1939, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on July 20, 1939.