[Civ. No. 13347. Second Dist., Div. Three. Sept. 28, 1942.]

THOMAS W. MATTHEWS, Respondent, v. THE ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY (a Corporation), Appellant.

Robert Brennan, M. W. Reed, Leo E. Sievert, H. K. Lockwood, L. W. Butterfield and Wm. F. Brooks for Appellant.

Hildebrand & Bills, Martin & Downey and Goodman & Brownstone for Respondent.

SHAW, J. pro tem.—Plaintiff, who was employed by defendant as a switchman in its yard at Barstow, brought this action to recover damages for personal injuries received by him during a switching operation in interstate commerce, alleging that the injuries resulted from negligence of his foreman in improperly directing a movement of cars so that a car on which plaintiff was riding crashed into other cars and plaintiff was thereby violently thrown against the car on which he was riding and injured. The verdict and judgment were for plaintiff, and defendant appeals from the judgment.

The accident occurred at night time on a dark night. Plaintiff was working in a switching crew consisting of himself, another switchman and an engine foreman named Walters who was in charge of the switching crew and directed its operations. On this occasion there were a number of cars to be switched. When this was done, the practice was that the car would be pushed toward the track onto which it was to be switched, then uncoupled from the train and allowed to roll onto the proper track by its own momentum, and that one of the switchmen would get on and ride it, using the hand brake to stop it when it got "into the clear" on the track to which it was switched. "Into the clear" means that the car is far enough from the entrance to the track so that it will not interfere with the movement of cars on adjacent tracks. Plaintiff was directed by the engine foreman to ride a car destined for a track designated as No. 3, and as the car passed him at the "divider switch," which was at some distance from the switch leading to Track 3, he got on at its rear end, where the hand brake was located, tried the brake and found it in good condition. Before the car got "into the clear" on Track 3 it ran against other cars which were on that track and stopped suddenly. Plaintiff had just started to set the brakes and the car was going about eight miles per hour at the time of the crash. He had his right hand on the brake and was holding one of the steps of the ladder on the car with his left hand. The sudden impact threw his body against the ladder, with his left arm between his body and the ladder, and caused injury to the left arm, for which this suit was brought.

This action was brought under the Federal Employers' Liability Act. That act makes every common carrier by rail-

road engaged in interstate commerce "liable in damages to any person suffering injury while he is employed by such carrier in such commerce, . . . for such injury . . . resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . ." (U. S. C.A., Title 45, § 51.) ■ The liability of a carrier under this act is predicated on negligence and the burden of proving such negligence rests on the plaintiff in any action brought under the act. (*Showalter* v. *Western Pac. R. R. Co.*, (1940) 16 Cal. (2d) 460, 471 [106 P. (2d) 895].)

■ The defendant contends that proof of such negligence is lacking here. Walters, the engine foreman under whom plaintiff was working, testified that it was the engine foreman's duty to know the condition of tracks with reference to whether or not they will hold cars that he intends to put into them, and that it was also his duty, if there was any condition he knew of in the tracks that he was going to switch cars into, anything that was unusual or might present some problem to some other movement or some member of the crew who had not had an opportunity to acquaint himself with the facts, to inform such crew member thereof, and that he would do so; and further that "primarily the responsibility of switching operations and the knowledge of the condition of the track into which cars were going is that of the foreman." Plaintiff testified, as to the custom in the Barstow yard, that "When he [the engine foreman] gives those track numbers to field cars into we got to assume that there is sufficient space in the tracks to hold the number of cars that goes in there, one or many." Plaintiff also testified that "It was the engine foreman's duty to inform me if there was anything out of the way with the job he had given me, that is, the places where the cars went and the tracks and the data." No one told the plaintiff there was not room on Track 3 to allow the car he was riding to go into the clear. It was dark and there were no lights in the yard and objects were difficult to see, and besides, plaintiff's view was obstructed by the body of the car in front of him, so that he could not see the condition of the track ahead of him. The results showed that there was not sufficient room on the track; hence the engine foreman was guilty of a breach either of his duty to inform himself, or of his duty to inform plaintiff of unusual conditions. The context of the testimony above quoted as to the duty of the engine foreman shows that it is also descriptive of a

custom in the Barstow yard. Violation of a known custom or duty constitutes negligence in such a case (*Showalter* v. *Western Pac. R. R. Co., supra,* (1940) 16 Cal. (2d) 460, 476 [106 P. (2d) 895] ; *MacDonnell* v. *Southern Pac. Co.,* (1936) 17 Cal. App. (2d) 432, 435 [62 P. (2d) 201]).

 Defendant further contends that such accidents as that in which plaintiff was injured were a part of the usual hazard of the work in which plaintiff was employed and therefore he assumed the risk thereof. Assumption of the risk is a defense to an action under the Federal Employers' Liability Act, but there are limitations to its scope, and the burden of proving it is upon the employer. The employee ''does not assume the risk of the negligence of a coworkman regarding whose careless acts he had no knowledge, unless as a reasonably prudent person under similar circumstances he would be presumed to have observed and appreciated them'' (*Crabtree* v. *Western Pac. R. R. Co.,* (1939) 33 Cal. App. (2d) 35, 42, 43 [90 P. (2d) 835] ; to same effect, *King* v. *Schumacher,* (1939) 32 Cal. App. (2d) 172, 177 [89 P. (2d) 466]). Under this rule the jury could properly find that plaintiff did not assume the risk here.

 In connection with the argument on assumption of the risk, defendant suggests that plaintiff was guilty of contributory negligence because he did not stop the car sooner. But there was testimony that the brake was in good working order and would stop the car at the speed it had when plaintiff was on it within twenty or twenty-five feet, and that to get the car into the clear it should have had forty or fifty feet more of clear space than there was on Track 3. Plaintiff was just setting the brakes when the accident happened, so if he had had this additional clear space there would have been no collision. He could be excused from seeing the cars ahead by reason of the darkness and the obstructions to his vision, as well as his right to rely on the orders given him. The question whether he was guilty of contributory negligence was, under the circumstances, a question of fact for the jury. Such negligence would not be a complete defense, but only a ground for diminishing the damages under the rule of comparative negligence. (U. S. C. A., Title 45, § 53.) If necessary to support the verdict in amount we must presume the jury found there was no such negligence.

 There is evidence conflicting in many respects with the testimony of plaintiff and others from which we have taken

the facts above recited. While plaintiff is corroborated on some points, it may be said that the verdict could not be supported without his testimony. All the other witnesses said the accident happened on Track 2, and there is no evidence of a lack of room for the car on that track and no sufficient evidence of any negligence on defendant's part if the car was switched onto Track 2. Plaintiff admitted at the trial the making of three statements regarding the accident, in each of which he more than once stated that the accident occurred on Track 2, but in his testimony he declared that these were erroneous. This situation, no doubt, has led defendant to make here an insistent argument against the credibility of plaintiff's testimony in this and other respects; an argument which might properly have been, and no doubt was, addressed to the jury, but which cannot prevail on appeal. There is nothing impossible or even inherently improbable about plaintiff's testimony. Everything to which he testified could have happened without doing violence to any of the laws of nature or any invariable pattern of human behavior. He was contradicted by other witnesses in the vital parts of his testimony; but whether he or the others should be believed was a question for the jury, upon which we are bound by their decision. "A conflict between the testimony of a witness and statements previously made by him presents a question to the jury or trier of facts and it is not the province of the appellate tribunal, under ordinary circumstances to interfere therewith." (*Williams* v. *General Ins. Co.*, (1936) 8 Cal. (2d) 1, 4 [63 P. (2d) 289]; to same effect, *Keyser* v. *San Diego Electric Ry. Co.*, (1936) 16 Cal. App. (2d) 48, 51 [60 P. (2d) 136]; *Hosman* v. *Southern Pacific Company*, (1938) 28 Cal. App. (2d) 621, 632 [83 P. (2d) 88]; *Smith* v. *Schwartz*, (1939) 35 Cal. App. (2d) 659, 663 [96 P. (2d) 816].) Defendant cites cases holding that the testimony of a witness may be disregarded where its value is destroyed by impeachment, but they are all cases where the testimony was disregarded in the trial court and such decision was affirmed on appeal. Such cases are not helpful here, where the testimony was accepted in the trial court.

It also appeared at the trial and was admitted by plaintiff that he had obtained employment from defendant under an assumed name and that in his written application he had not only used this false name but had set forth the record of the

person whose name he used and had stated his age as 41 when it was in fact 53. Defendant urges these facts also against the credibility of plaintiff as a witness, to which argument the answer is that already stated. ▮ It further contends that by reason of this use of a false name plaintiff never became its employee and is precluded from maintaining this action against it. Plaintiff did these acts, doubtless, to conceal from defendant the facts that it had, some 25 years before, discharged him for breach of its rules, and that his age was above that at which it would take on new employees. A similar situation arose in *Phillips* v. *Southern Pacific Company*, (1936) 14 Cal. App. (2d) 454, 457 [58 P. (2d) 688], where the plaintiff suing under the Federal Employers' Liability Act had obtained employment under an assumed name, concealing his record of discharges from previous railroad employments. On these facts the court declared the rule to be "that such concealment does not vitiate the contract of employment and prevent recovery unless there is shown to be a causal connection between the injury and the misstatements in the application for employment." In the present case the plaintiff passed a physical examination before going to work and worked for two years after his employment, and his services were declared to be satisfactory by his superior. The misrepresentation may have furnished reason for rescinding the employment contract, but if so, this was not done. It did not render his employment void. (*Phillips* v. *Southern Pacific Company, supra; Minneapolis St. Paul & S. Ste. M. R. Co.* v. *Borum,* (1932) 286 U. S. 447 [52 S. Ct. 612, 76 L. Ed. 1218].)

▮ Defendant calls our attention to testimony indicating that the effect of plaintiff's injuries may be more serious because of his age than if he were younger and argues that this brings the case within the qualification of the rule above quoted. But the statement there about "a causal connection between the injury and the misstatements" refers to the happening of the injury, not to its effects. It does not appear that plaintiff's age had anything to do with the occurrence of the accident. He was not beyond the age of agility, if that was needed in his employment; nor does it appear that defendant would not permit persons of plaintiff's actual age to do for it the work plaintiff was doing, if they had been previously employed, but merely that they would not be taken on as new employees.

▮ After the injury of which plaintiff complains, he

was taken to defendant's hospital and there treated for some time by defendant's physician. Then he went back to work and worked for a short time; but before doing so went to the office of defendant's claim agent, where he was paid $75 and signed a release purporting to release defendant from any and all claims which he had or thereafter might have on account of the injuries in question, including any injuries which might thereafter develop. This release was pleaded as a defense and is now urged as a bar to plaintiff's action. Regarding this release and the circumstances surrounding its execution, plaintiff testified that he was required to sign it before he could go back to work, that he had just been released from defendant's hospital, that defendant's doctors had given him a release to work and told him he was "O. K. to go to work" and had recovered from his injury, and that the claim agent told him "you have been discharged from the hospital all cured up." The defendant's physician, while without a clear memory of his conversation with plaintiff, conceded that "I probably told him I thought he had recovered from this injury." Plaintiff further testified that no one had told him he would not be able to work as a switchman and that when he signed the release he thought he was cured. When plaintiff went back to work his arm was sore and painful at times during his working hours and did not have enough strength to hold his weight on that side—something he had to do in performing the duties of a switchman—and after working for a while he found that he could not perform the duties of a switchman. Before bringing this action plaintiff, through one of his attorneys, offered to return to defendant the amount paid upon the release, but this offer was rejected by the defendant.

Under the circumstances thus shown, plaintiff was entitled to rescind the release and by his rescission its effect as a release was destroyed. ▪▪▪ A release is a contract and as such is subject to rescission for the same reasons as are other contracts, including fraud and mistake of fact. (*Garcia* v. *California Truck Co.*, (1920) 183 Cal. 767, 769 [192 Pac. 708]; *Miller* v. *Brode*, (1921) 186 Cal. 409, 416, 417 [199 Pac. 531]; *O'Meara* v. *Haiden*, (1928) 204 Cal. 354, 358 [268 Pac. 334, 60 A. L. R. 1381]; *Touhy* v. *Owl Drug Co.*, (1935) 6 Cal. App. (2d) 64, 68 [44 P. (2d) 405]; *Hudgins* v. *Standard Oil Co.*, (1933) 136 Cal. App. 44, 55 [28 P. (2d) 433]; *Gambrel* v. *Duensing*, (1932) 127 Cal. App. 593, 604 [16 P. (2d) 284];

*Charleville* v. *Metropolitan Trust Co.,* (1934) 136 Cal. App. 349, 356 [29 P. (2d) 241].) ▮▮▮ The statement made to plaintiff by defendant's physicians, that he had recovered, was one of fact. (*Missouri K. & T. Ry. Co. of Texas* v. *Haven,* (Tex. Civ. App. 1917) 200 S. W. 1152, 1155; *Missouri Pac. R. Co.* v. *Elvins,* (1928) 176 Ark. 737 [4 S. W. (2d) 528, 530] ; *Atchison, Topeka & Santa Fe Ry. Co.* v. *Peterson,* (1928) 34 Ariz. 292 [271 Pac. 406, 409] ; *Macklin* v. *Fogel Constr. Co.,* (1930) 326 Mo. 38 [31 S. W. (2d) 14, 18].) It was believed by plaintiff, and if it was also believed by the physician, the case is one of mutual mistake. If the statement was not believed by the physician, we have a case of fraud. In either case the plaintiff was entitled to rescind, and it is not disputed here that the steps he took were sufficient to accomplish that result. Since there was an effective rescission of the release, we need not inquire whether by its terms it comprehends the damages now sued for, or whether section 1542 of the Civil Code would operate to exclude them from its scope. Hence the case of *Berry* v. *Struble,* (1937) 20 Cal. App. (2d) 299 [66 P. (2d) 746], which relates to those matters, and on which defendant relies, is not in point here.

▮▮▮ Defendant's final contention is that the damages awarded to plaintiff, in the sum of $9,640, are excessive. At the time of the accident plaintiff was 55 years of age and had a life expectancy of 17.4 years. At that time he was paid at a rate which, if he worked regularly, would have amounted to "between $210 and $215 a month," but his actual earnings were only $2,200 per year. The amount of his prospective earnings at this rate would have a present value of $22,000, and since the verdict is less than half this amount, the jury must have made a considerable allowance for contingencies.

About eighteen months after the accident plaintiff consulted Dr. Spiers, a physician specializing in bone and joint surgery. Dr. Spiers did not treat plaintiff, but examined him for the purpose of diagnosis. From his testimony it appears that plaintiff's trouble was in his left elbow, which had a limited range of motion and was not of normal shape. Dr. Spiers testified that he found several abnormal conditions in plaintiff's left elbow, but that none of these was caused or produced by the accident; they came from some pre-existing injury. Dr. Spiers expressed this opinion: "this man suffered an injury some time prior, probably long prior to the injury of which he is complaining, and had a disabled elbow. That at the

time of the accident he exacerbated . . . a pre-existing injury, and that he is suffering from osteoarthritis of the elbow, exacerbated by the injury he received.'' Plaintiff testified that previous to the accident he had had no trouble with this elbow and had always been able to do his work as a switchman; and to a question reciting these facts and plaintiff's present disability, Dr. Spiers answered: ''That this joint was apparently functioning all right until he had his injury, and the injury was sufficient to light up and produce a series of symptoms which has made that joint not usable as a working member since.'' He also testified that plaintiff is not able to do the work of a railroad brakeman or switchman. Being asked if plaintiff's condition were permanent he answered: ''If he were younger, there is a possibility he might be able to get back. But these things are very long prolonged. At this man's age, my opinion is that he will never be able to go back to a job as a switchman.'' He further testified: ''Q. Now, Doctor, as to the factor of age and time in a condition of this kind, assuming that this condition as disclosed by the X-rays of an old existing injury were quiescent or quiet, if the man was going about doing manual work, railroad work, working as a switchman, performing his work comfortably with no complaint, and doing the work required of him, do you have any opinion as to how long he might be able to continue in his occupation, assuming that he never suffered any trauma or any injury by an external violent means to that member which had the long existing condition which you have described and which is now quiescent?'' ''A. I do not know how long he had gone on. He might have gone on for years all his natural life without having the symptoms, and then an injury or a violent nature light it up—he could have gone on maybe two years, five years, or ten years, I don't know.'' He also said that before plaintiff's injury the condition existing in his elbow was quiet and the injury aroused it from a quiescent condition to an active one; that such a change is usually started by some rather serious injury, usually by something more than a mere bump; and that it must be something which tears the ligaments a little and disturbs the joint.

Analyzing this medical testimony we notice that the accident merely aggravated a pre-existing condition. This, however, does not prevent plaintiff from recovering. ''An accident which aggravates a preexisting disease may constitute a cause of action for damages. In such a case plaintiff may

recover all damages for such aggravation." (*Smith* v. *Schumacker*, (1938) 30 Cal. App. (2d) 251, 263 [85 P. (2d) 967].)

It is apparent that very little could properly be awarded plaintiff for pain and suffering. He testified to pain only during the first night and "at times" while he worked after the accident. The award must be regarded as one given mainly for loss of earning power, and as such it is defended. Defendant contends that plaintiff is not entitled to recover anything for loss of future earnings as a railroad man because after the disclosure of his falsification of his record in his application for employment he could no longer obtain employment with any railroad. We find no evidence of the fact on which this argument is based. While there is testimony that defendant would not employ him by reason of his falsification, as well as his age, we find no showing that he could not get railroad employment anywhere. We cannot say, without evidence, that other railroads would not view plaintiff's case more leniently than does defendant.

In *Bellman* v. *San Francisco H. S. Dist.*, (1938) 11 Cal. (2d) 576, 588 [81 P. (2d) 894], a personal injury case where plaintiff's physician testified only to a probability of permanent injury, the court reduced the damages by two-thirds, saying: "The jury may not consider consequences which are only likely to occur. 'To entitle a plaintiff to recover present damages for apprehended future consequences, there must be evidence to show such a degree of probability of their occurring as amounts to a reasonable certainty that they will result from the original injury.' (*Bailey* v. *Yosemite Portland Cement Corp.*, 136 Cal. App. 111 [28 P. (2d) 65]; *Silvester* v. *Scanlon*, 136 Cal. App. 107 [28 P. (2d) 97].) No such certainty is shown in the evidence in this case." In the present case it is shown that plaintiff is and will be disabled from performing the duties of a railroad brakeman or switchman, and from the fact that he has done no other sort of work during his active life of thirty years or more the jury might infer that he could do nothing else, and that a disability in this occupation is as to him a total disability. But, since his case is one of aggravation of a previous condition, he can recover only such damages as result from the aggravation; not those which would have been caused by the previous condition without the aggravation. And he has the burden of proving with reasonable certainty that his future disability for which he claims damages will be the result of the aggrava-

tion rather than the natural development of the previous condition.

Here it appears that, in spite of his previous injury, the plaintiff was doing his work successfully and had been doing so for many years. The medical testimony shows that, in the absence of some further physical injury to plaintiff's elbow, he could have continued to use it in his work for an indefinite time. In other words, no time at which the previous injury would have ended plaintiff's ability to work at his occupation appears. In the absence of such a showing the jury might presume that his ability to work would continue as long as is usual with things of that nature (Code Civ. Proc., § 1963, subd. 32), and in determining how long this would be they could consider plaintiff's history, as related to them, and his apparent physical condition, as well as the medical testimony. That testimony showed that the injury necessary to aggravate the condition in plaintiff's elbow from a quiescent one to an active one would be some rather serious injury—something more than a mere bump. In estimating the damages they were not required to assume the happening of any such injury.

The question whether the evidence does show with reasonable certainty that plaintiff's future disability will result from the aggravation of his previous condition by his injuries rather than from the previous condition alone is primarily one for the jury. "It is elementary that the assessment of damages is a matter committed to the discretion and sound judgment of the trier of facts, whose conclusion will not be disturbed by an appellate court unless the sum awarded is so disproportionate to the injury proved as to justify the view that it was given under the influence of passion or prejudice." (*Bechtold* v. *Bishop & Co., Inc.,* (1940) 16 Cal. (2d) 285, 293 [105 P. (2d) 984].) "An appellate court may not interfere unless the amount of the damages finally allowed is so 'outrageously excessive as to suggest, at the first blush, passion or prejudice. . . .' " (*Hicks* v. *Ocean Shore Railroad, Inc.,* (1941) 18 Cal. (2d) 773, 785 [117 P. (2d) 850].) Under the rules thus established we may not interfere with the amount of the verdict here.

The judgment is affirmed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 27, 1942.