**Gaylord HOLLADAY, Plaintiff,**

**v.**

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Defendant.**

Civ. No. 6-1759-C-1.

United States District Court
S. D. Iowa,
Central Division.

May 23, 1966.

As Amended June 27, 1966.

Carl H. Lambach and Margaret Stevenson, Davenport, Iowa, for plaintiff.

Thomas F. Daley, Jr., and Ralph D. Sauer, Davenport, Iowa, for defendant.

## MEMORANDUM

STEPHENSON, Chief Judge.

1. Plaintiff, Gaylord Holladay, brought this action for $350,000 damages allegedly incurred by him as a result of the negligence of his employer, the defendant, Chicago, Burlington & Quincy Railroad Company, in spraying the railroad right of way with herbicides, where defendant was working as a switchman, under such circumstances as to cause plaintiff to suffer peripheral neuritis. The action was brought under the provisions of the Federal Employers' Liability

Act (FELA).[1] The plaintiff is a resident of Davenport, Iowa. Defendant is a corporation carrying on its business as an interstate common carrier of passengers and freight by railroad within the jurisdiction of this Court. It is agreed by the parties that the work duties of the plaintiff at all times material thereto substantially affected and were in furtherance of interstate commerce. Upon stipulation of the parties a jury was waived and all issues were tried to the Court.

2. On July 20, 1962, pursuant to a contract, the Nalco Chemical Company applied certain chemical weed sprays on or about the tracks of the defendant railroad between Barstow and Rock Island, Illinois. The substances applied were weed and grass control chemicals identified as: Dupont-Karmex (Karmex), Dow —Formula 40 (2,4–D), Nalco H–187–D (H–178–D).[2] These chemicals were mixed with water and sprayed along the railroad right of way between Barstow and Rock Island on July 20, 1962; the spraying being completed by about 2:30 p. m. that day. The Nalco Company furnished the chemical and spraying equipment used and all the personnel [3] including a supervisor to direct the application of the spray. The defendant furnished the necessary train service needed in performing the work and the tank cars and water used in applying the chemicals. It is undisputed that the spraying was done under the supervision and direction of and by Nalco employees.

3. Plaintiff commenced his duties on the switching crew for defendant at 4:00 p. m. on the date in question and completed his shift ten and one-half hours later. He began his work at Rock Island, Illinois and went to Davenport, Iowa, then back to Rock Island and on to Moline, East Moline, Silvis [4] and Barstow, Illinois. The work consisted of picking up cars at these various stations for the making up of trains. Plaintiff's duties required him to dismount from the train at various intervals for the purpose of picking up cars in the yards to make up the trains. In doing so plaintiff's clothes became saturated with moisture from the weeds. He wore a sleeveless shirt and his arms became wet as did his shoes and trousers. No facilities were available for washing up or changing clothes, so plaintiff remained in his wet clothes until he arrived at home where he took a shower before retiring.

4. A few days after the spraying plaintiff noticed a fine rash over his entire body. He visited his family doctor on July 27, 1962. He complained of tin-

---

1. 45 U.S.C. § 51 et seq.

2. The ingredients of the substances are as follows:

Du Pont – Karmex –
Diuron [3–3, 4–dichlorophenyl]–1,1–dimethylurea] ........80%
Inert Ingredients ...................................20%

Dow – Formula 40 –
Alkanoloamine Salts (of the Ethanol and Isopropanol series)
    of 2,4–Dichlorophenoxyacetic Acid ...................65%
Inert Ingredients .......................................35%

Nalco – Nalco H–178–D
Aromatic Petroleum Oil ...............................92.0%
Pentachlorophenol ..................................... 4.3%
Other Chlorophenols .................................. 0.5%
Inert Ingredients ..................................... 3.2%

---

3. One employee of defendant was stationed on the spray car to see that the spray plan agreed to was followed.

4. There is some indication no work was performed at Silvis.

gling in his hands and feet and generally, that he did not feel well. Thereafter, his condition worsened and on August 7, 1962, he was admitted to the Veteran's Administration Hospital in Iowa City, Iowa. Eventually his illness was diagnosed as peripheral neuritis, which, in general, involved loss of function of the nerves in the extremities. Considerable hospitalization and medical attention was required before plaintiff was able to work. He commenced working at other employment on June 1, 1964.

5. Plaintiff claims defendant was negligent in failing to provide him with a safe place to work and in failing to warn him of the presence of a toxic substance in the area and of the danger and hazards of coming in contact therewith. Plaintiff further claims that the negligence of defendant was a proximate cause of his subsequent illness. He asks damages for his medical expense, loss of earnings, pain and suffering and permanent disability resulting therefrom. Defendant denies it was negligent in any regard and further denies that there was any causal connection between its spraying operation and plaintiff's subsequent illness.

### NEGLIGENCE

6. The railroad is not an insurer of the safety of its employees, but under the FELA is liable only for its negligence or that of its agents or employees which results in injury to an employee. Inman v. Baltimore & O. R. R., 361 U.S. 138, 80 S.Ct. 242, 4 L.Ed.2d 198 (1959); Wilkerson v. McCarthy, 336 U.S. 53, 69 S.Ct. 413, 93 L.Ed. 497 (1949). Reasonable foreseeability of harm is an essential ingredient of negligence under the Act. Gallick v. Baltimore & O. R. R., 372 U.S. 108, 117, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963); Rogers v. Missouri Pac. R. R., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957); Rubley v. Louisville & Nashville R. R., 208 F.Supp. 798, 802 (E.D. Tenn.1962). However, foreseeability of

the harm that actually occurred is not required. " * * * a tort feasor must compensate his victim for even the improbable or unexpectedly severe consequences of his wrongful act." 372 U.S. at p. 121, 83 S.Ct. at p. 667. Moreover the mere fact that the spraying activity was performed by employees of Nalco Company under a contract with defendant does not relieve defendant of fault attributable to employees of said company. Sinkler v. Missouri Pac. R. R., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799 (1958). Defendant had a non-delegable duty to furnish its employees a safe place to work. Payne v. Baltimore & O. R. R., 309 F.2d 546, 549 (6th Cir. 1962). What is reasonable care depends on the circumstances. Bailey v. Central Ver. Ry., 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943). The standard of care must be commensurate with the danger involved. Tiller v. Atlantic Coast Line R. R., 318 U.S. 54, 67, 63 S.Ct. 444, 87 L.Ed. 610 (1942).

7. In the matter at hand defendant urges that the railroad does not have a duty to warn of unusual or improbable occurrences which a reasonable and prudent man would not anticipate. See Burpo v. Chesapeake & O. Ry., 266 F.2d 512 (6th Cir. 1959); Santoro v. Lehigh Valley R. R., 148 F.Supp. 594 (D.N.J.1957). In this connection defendant offered evidence which showed that Nalco Company had sprayed thousands of miles of railroad right of way in 1962 for some fifty-five railroads with no claim of injury.[5] The company sprayed or sold over two million gallons of H–178–D from 1960 to 1962 (inclusive) with no claim of injury other than plaintiff's. In addition 2,4–D has been used by millions of homeowners for many years.

8. On the other hand, plaintiff offered evidence which showed that the herbicides used in this case were known to be toxic to animals and in some measure toxic to man. This evidence included

5. Exhibit J shows Nalco Co. sprayed the same chemicals involved herein in 1962 as follows: H–178–D, 588,568 gal.; 2,4–D, 34,260 gal.; Karmex, 105,200 lbs.

an article [6] published in 1959 in the Journal of the American Medical Association discussing three cases where symptoms and signs of a general toxic reaction, as well as involvement of the peripheral nervous system developed after heavy exposure to an ester of dichlorophenoxyacetic acid (2,4–D). Plaintiff contends that the mere fact that the herbicides involved may have been used by many over a considerable period of time without injury does not preclude a finding of foreseeability and negligence. It is sufficient that the supplier and distributor knew or should have known there was some probability of harm sufficiently serious that ordinary men would take precaution to avoid it. See Roberts v. United States, 316 F.2d 489, 494–495 (3d Cir. 1963).

■■■ 9. Nalco Chemical Company in compounding, distributing, and applying the herbicides is held to the skill of an expert and consequently "is charged with superior knowledge of the nature and qualities of its products, and is obligated reasonably to keep abreast of scientific information, discoveries and advances with respect thereto." LaPlant v. E. I. DuPont DeNemours and Co., 346 S.W. 2d 231, 240 (Mo.Ct.App.1961). There exists a duty to warn of the danger involved in use of the product unless there is reason to believe those likely to use the product will realize its dangerous condition. See Briggs v. National Industries, Inc., 92 Cal.App.2d 542, 207 P.2d 110, 112 (1949). Restatement, Torts 2d § 388 (1965). The manufacturer is not charged with warning of possible danger where the risk is rare and the injury results from some unusual use or some personal idiosyncrasy of the consumer. Merrill v. Beaute Vues Corp., 235 F.2d 893, 899 (10th Cir. 1956);

Bennett v. Pilot Products Co., 120 Utah 474, 235 P.2d 525, 527, 26 A.L.R.2d 958 (1951); Bonowski v. Revlon, Inc., 251 Iowa 141, 145–148, 100 N.W.2d 5 (1959). However, some courts have held that where the proof shows that a "small proportion" will be injuriously affected by use of the product there is a duty to warn accordingly. See concurring opinion, Merrill, supra, 235 F.2d at 898–900.

■■■ 10. In determining the duty of care required of defendant in the case at hand, the likelihood of harm, and the gravity of harm if it happens, must be weighed against the burden of the precaution which would be effective to avoid the harm.[7] Samples of the labels used on each of the herbicides involved herein were received in evidence. They all contained a warning that the product causes irritation of the skin and that contact with the skin and clothing should be avoided.[8] A representative of the Nalco Company testified that the employees who did the spraying were instructed to wash after being in contact with the spray and that soap and water was supplied on the spray car for that purpose. The record indicates no warning was given to plaintiff or members of the switching crew by defendant of the danger of exposure to the herbicides. It is the view of the Court that upon the record in this case the requirement of ordinary care imposed a duty on the defendant to warn plaintiff of the presence of toxic substances in the area and the danger of exposure thereto. Ordinary prudence dictates that at least a warning should have been given to avoid contact and where exposed, the skin be cleansed with soap and water. The Court finds thus the defendant was

---

6. Peripheral Neuropathy After Exposure to an Ester of Dichlorophenoxyacetic Acid, Vol. 171, J.A.M.A., 306 (Nov. 7, 1959). Authors were three physicians of the Mayo Clinic, Rochester, Minn.

7. See Harper and James, Law of Torts, § 28.4 at 1542 (1956).

8. For a typical warning see Exhibit 8A, Dow-Formula 40 (2,4–D):

CAUSES IRRITATION OF SKIN AND EYES
Do Not Get in Eyes, on Skin or on Clothing
in case of contact, flush eyes with plenty of water for at least 15 minutes and get medical attention; wash skin with soap and plenty of water. Remove and wash contaminated clothing before re-use. Do not wear contaminated shoes.

negligent in failing to warn plaintiff of the presence of a toxic substance in the area and of the dangers and hazards of coming in contact therewith.

## PROXIMATE CAUSE

▮ 11. Under FELA, liability is imposed for " * * * injury or death resulting in whole or in part from the negligence * * *" 45 U.S.C. § 51. Defendant is responsible if his negligence played any part in producing the injury for which damages are sought. *Rogers,* supra, 352 U.S. at 506, 77 S.Ct. 443.

12. A review of the spraying schedule and plaintiff's work schedule indicates that the elapsed time between spraying and plaintiff's exposure to the herbicides was a minimum of approximately four hours. Generally the chemicals here used are ninety percent (90%) absorbed into the plant within two hours and absorption continues thereafter.[9] However, it is probable that during the time plaintiff worked in the area some residue of all chemicals remained on the foliage. Plaintiff during his work shift was exposed at least four hours to weeds sprayed with chemicals. His trousers were soaked and he noted oil on his cuffs. Water was used to spread the chemicals which were in an oil emulsion. Oil facilitates absorption of the chemicals into the plants. Plaintiff did not wash or remove his clothes until he returned home.

13. Plaintiff was initially hospitalized at the Veterans Administration Hospital for a period of 17 days.[10] His condition was diagnosed as "Peripheral Polyneuropathy secondary to alcohol and dietetic factors."[11] Plaintiff continued to have pain and was unable to work. He returned to the VA Hospital on September 5, 1962, where he received extensive treatment. He was discharged from bed patient care

April 11, 1963. During this period plaintiff was sent home on leave on several occasions. He was hospitalized a total of 84 days. Upon discharge his condition was diagnosed as "Peripheral Neuritis, etiology undetermined, possibly due to arsenic or 2,4–D, treated, improved."[12]

14. The testimony of several physicians and other experts in the field of chemistry and pharmacology were offered in behalf of both parties on the issue of proximate cause. They ventured opinions that ranged from "no causal connection" between plaintiff's exposure to the sprayed weeds and his illness, to "most likely" causal connection. The physicians agreed that plaintiff suffered from peripheral neuritis, they differed as to its probable cause. The record indicates that reported cases indicating development of peripheral neuritis after exposure to 2,4–D are comparatively rare.[13] In this part of the country the most common etiology for peripheral neuropathy is either diabetes or alcoholism with malnutrition. Other causes include hyperthyroidism, improper nutrition, viral infection, flu, and arsenic poisoning.

15. Plaintiff, who was approaching the age of 40 when the spraying incident occurred, was discharged from the service in 1945 with a service connected disability for "nervousness," rated at a ten percent (10%) disability for which he still draws compensation. A few years later and prior to his marriage in 1950, plaintiff committed himself to a government hospital for treatment of alcoholism. After his marriage he discontinued drinking hard liquor, but drinks on the average of from four to six beers a night. The VA Hospital records indicate that on his second admission in early September 1962, plaintiff furnished a history, a part

---

9. Karmex is absorbed into the ground.

10. See Par. 4, supra.

11. Exhibit 1, page 2, Narrative summary, dated 8–23–62 (VA Hosp. records)

12. Exhibit 1, page 5, narrative summary, dated 4–23–63 (plaintiff's VA Hosp. record)

13. See Neuropathy Following Exposure to a Dimethylamine Salt of 2,4–D, Archives of Internal Medicine, Vol. 111, number 3, March 1963. See also Note 4, supra.

of which is summarized as follows: " * * almost ten months prior to his hospitalization, the patient had noticed a gradual onset of numbness in his feet and for three months before admission he developed a numbness in his fingertips of both hands which progressed to the point that he felt unsure of himself working on the railroad. Six weeks before admission, he developed pain in his feet which was made worse by walking." [14] The foregoing are all symptoms of peripheral neuritis. Plaintiff now denies that he had any such symptoms prior to July 20, 1962. During his testimony at the trial the plaintiff exhibited a very poor memory. He was seen by his family physician about a month prior to July 20, 1962; he had a sore throat. Plaintiff himself recalled very little concerning this illness or about any visits to his family physician prior to the instant illness. He did recover from the flu and sore throat and had been working about a month when the weed spraying took place. As previously indicated he last worked on August 5, 1962, and was hospitalized on August 7, 1962.

16. Upon review of the entire record, the Court finds that plaintiff was suffering from peripheral neuritis prior to July 20, 1962. It had not, however, reached an acute stage. It was not of sufficient severity to be disabling. On July 20, 1962, plaintiff was exposed to toxic substances contained in the weed spray to the extent that his condition of peripheral neuritis was aggravated and plaintiff was thereby caused to suffer an acute and disabling peripheral neuritis, which required hospitalization and treatment over an extended period of time. The defendant's negligence was a proximate cause of plaintiff's condition of ill being that existed after July 20, 1962.

## CONTRIBUTORY NEGLIGENCE

17. The Court finds that plaintiff was not guilty of contributory negligence.

## DAMAGES

18. An injured party is entitled to recover such damages as will reasonably compensate him for the injury and damage sustained as a proximate result of the negligence of others. This includes damages for aggravation of a pre-existing condition. He is not, however, entitled to recover for damages which would have resulted from his previous condition without the aggravation. Matthews v. Atchison, T. & S. F. Ry., 54 Cal.App.2d 549, 129 P.2d 435 (1942); see also Henderson v. United States, 328 F.2d 502, 504 (5th Cir. 1964); Evans v. S. J. Groves & Sons Co., 315 F.2d 335, 347–349 (2d Cir. 1963); 25 C.J.S. Damages § 21, at pp. 658–661. A plaintiff must exercise reasonable care and diligence to minimize or lessen his damages, and to the extent that his damages are the result of his active and unreasonable enhancement thereof, or due to his failure to exercise such care, he cannot recover. He must do nothing to aggravate his loss. Commodity Credit Corp. v. Rosenberg Bros. & Co., 243 F.2d 504, 511 (9th Cir. 1957); Lewis v. Pennsylvania R. R., 100 F.Supp. 291, 294 (E.D.Pa. 1951). The defendant is not liable for "avoidable consequences." Ellerman Lines Ltd. v. The President Harding, 288 F.2d 288, 289–290 (2d Cir. 1961); Restatement, Torts § 918 (1939).; 2 Harper & James, Law of Torts § 25.4 (1956).

19. At the time of plaintiff's initial admission to the hospital on August 7, 1962, he had considerable pain in his feet and legs. Later his hands became involved. During the forepart of his hospitalization considerable amounts of drugs were administered to plaintiff for the purpose of relieving pain. Plaintiff improved to the extent that he was granted short leaves commencing October 12, 1962. On December 12, 1962, plaintiff was sent home on leave to return in one month and thereafter until his discharge in April he was seen on monthly intervals. Following his discharge in April, plain-

14. Dr. F. David Fisher who took the history testified that this summary was substantially correct.

tiff continued to experience some numbness in his hands and feet; his gait and balance was not good. He drove a car at first with some difficulty and helped around the house and in the garden. Plaintiff received no further medical attention of any consequence. The only medical expense, including drugs, for which plaintiff asks recovery is the bill from the Veterans Administration Hospital covering the period up to his discharge (exhibit 9). The parties stipulated that the charges thereon were fair and reasonable. No basis for an allowance of future medical expense has been shown.

20. Although plaintiff was discharged from the hospital in April 1963, he was not employed until June 1, 1964, when he secured employment as a janitor at a salary of $4,500 annually. On January 1, 1966, this salary was raised to $4800. His 1960 and 1961 earnings as an employee of defendant were approximately $6,000 annually. Plaintiff has failed to establish that this failure to secure employment for the entire fourteen months after he left the hospital was a proximate result of his illness.

21. Plaintiff has suffered a limited degree of disability as a proximate result of his illness. He cannot perform tasks requiring prolonged walking, or those requiring agility such as getting on and off moving box cars. In this regard it would be hazardous for him to return to his former employment. In his present job he performs general maintenance including the mowing of the lawn. He has no difficulty on level ground but in mowing terraces he has some difficulty with his ankle. His future earning capacity has been diminished to the extent that he cannot perform work requiring prolonged walking or more than ordinary agility on his feet.

22. During his illness plaintiff was warned on several occasions to abstain from the use of alcohol. However, except when actually hospitalized, plaintiff has generally continued to follow his long standing practice of drinking from four to six beers each night. plaintiff has generally continued to folto the length and severity of his illness. Plaintiff has failed to use due care in this regard and his conduct has aggravated the length and severity of his illness. This will be considered by the Court in fixing damages incurred by plaintiff after his discharge from the hospital in April 1963.

23. Defendant's negligence was a proximate cause of the acute and disabling peripheral neuritis which required plaintiff's hospitalization and treatment. Plaintiff will therefore be compensated in full for the damages he has sustained as a result thereof. His condition prior to July 20, 1962, would have worsened in time without defendant's negligent act. This will be considered by the Court in determining the extent of future damages.

24. In summary the Court finds that plaintiff has established that he has sustained compensable damages as follows:

Medical expenses, hospitalization and drugs ............... $ 7,350.96
Loss of earnings to present ............................... $ 9,000.00
Loss of earnings in the future due to
    diminished earning capacity ......................... $ 6,000.00
Past pain, suffering and disability ...................... $ 3,500.00
Future pain, suffering and disability .................... $ 1,500.00
                                                          $27,305.96

The foregoing shall constitute the Court's findings of fact and conclusions of law under Rule 52 Fed.R.Civ.P. Judgment will be entered accordingly in favor of the plaintiff and against the defendant.

### Order on Motion to Amend

This matter is now before the Court upon the motions of the plaintiff and the defendant to amend findings of fact, conclusions of law and judgment. Plaintiff appeared by his counsel, Margaret Stevenson and Carl H. Lambach. Defendant appeared by its counsel, Thomas F. Daley and Ralph D. Sauer. After examining the foregoing motions and hearing the arguments of counsel, the Court finds that the motion of plaintiff should be denied. The Court further finds that the amount allowed the plaintiff for medical expense, hospitalization and drugs in the sum of $7,305.96, which sum had been agreed to by pre-trial stipulation of the parties, was in error and there was a mutual mistake, and now upon stipulation of the parties the foregoing figures should be amended to $3,798.70.

It is ordered that the motion of the plaintiff to amend findings of fact and judgment is denied.

It is further ordered that the motion of the defendant to amend finding No. 24 is granted. The figure $7,305.96 in No. 24 is stricken and in lieu thereof is inserted the figure $3,798.70, so that it will read as follows: "Medical expenses, hospitalization and drugs $3,798.70."